**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Alejandrina TORRES, et al.,
Defendants-Appellees.**

No. 84–1077.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1984.

Decided Dec. 19, 1984.

Certiorari Denied March 25, 1985.
See 105 S.Ct. 1853.

Cudahy, Circuit Judge, concurred in result and filed opinion.

Joseph H. Hartzler, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellant.

David C. Thomas, Chicago Kent College of Law, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This appeal by the United States raises two novel and important questions: whether the federal government may ever secretly televise the interior of a private building as part of a criminal investigation and use the videotapes in a criminal trial, and if so whether the warrants under which television surveillance was conducted in this case complied with constitutional requirements. A federal grand jury indicted the four defendants, who are members of the FALN (Fuerzas Armadas de Liberacion Nacional Puertorriquena), on charges of seditious conspiracy (18 U.S.C. § 2384) and related weapons and explosives violations. On the eve of trial, the district judge ordered the suppression of videotapes that the FBI had made as part of its surveillance of two FALN safe houses. 583 F.Supp. 86, 99–105 (N.D.Ill.1984). The government appeals this order under 18 U.S.C. § 3731. The videotapes had no sound track; but at the same time that the FBI was televising the interior of the safe houses it was recording the sounds on different equipment. The judge refused to order suppression of the sound tapes, and they are not in issue in this appeal.

The FALN is a secret organization of Puerto Rican separatists that has been trying to win independence for Puerto Rico by tactics that include bombing buildings in New York, Chicago, and Washington. The bombs are assembled and stored, and members of the organization meet, in safe houses rented under false names. The bombings have killed several people, injured many others, and caused millions of dollars

of property damage. See 583 F.Supp. at 91; *In re Special February 1975 Grand Jury,* 565 F.2d 407, 409–10 (7th Cir.1977); *United States v. Rosado,* 728 F.2d 89, 91–92 (2d Cir.1984); *In re Archuleta,* 561 F.2d 1059, 1060 (2d Cir.1977); *In re Cueto,* 443 F.Supp. 857, 858 (S.D.N.Y.1978); Breasted, *3-Year Inquiry Threads Together Evidence on F.A.L.N. Terrorism,* N.Y. Times, April 17, 1977, at p. 1; Donner, The Age of Surveillance 459 (1980) (the FALN "is notorious for its unique indifference to personal injury and possible death randomly inflicted by bombs planted in public places"); Motley, US Strategy to Counter Domestic Political Terrorism 18, 76 (1983).

The background to the present case is the arrest in 1980 in a Chicago suburb of several members of the FALN, one of whom agreed to help the FBI's investigation of the organization. He identified as members two of the people later charged in this case. FBI agents followed one, who unwittingly led the agents to an apartment in Chicago that was being used as an FALN safe house. The U.S. Attorney obtained from Chief Judge McGarr of the Northern District of Illinois an order authorizing the FBI to make surreptitious entries into the apartment to install electronic "bugs" and television cameras in every room. The FBI wanted to see as well as hear because it had reason to believe that the people using the safe houses, concerned they might be bugged, would play the radio loudly when they were speaking to each other and also would speak in code, and that the actual assembly of bombs would be carried on in silence. The television surveillance of the first apartment paid off: the FBI televised two of the defendants assembling bombs. On the basis of these observations the FBI obtained a search warrant for the apartment and found dynamite, blasting caps, guns, and maps showing the location of prisons. Tailing the same two defendants led to the second safe house involved in this appeal. Again a warrant was obtained to conduct electronic, including television, surveillance; and it was by televising meetings in this safe house that the other two defendants in this case were identified.

The trial judge held that there was no statutory or other basis for Chief Judge McGarr's order authorizing television surveillance of the safe houses and that therefore the fruits of the surveillance, including the videotapes, would be inadmissible in the defendants' forthcoming trial. 583 F.Supp. at 105. The defendants and amici curiae advance the following additional grounds for this result: television surveillance in criminal investigations (other than of foreign agents) is forbidden by federal statute; it is in any event so intrusive—so reminiscent of the "telescreens" by which "Big Brother" in George Orwell's *1984* maintained visual surveillance of the entire population of "Oceania," the miserable country depicted in that anti-utopian novel—that it can in no circumstances be authorized (least of all, one imagines, in the year 1984) without violating both the Fourth Amendment and the Fifth Amendment's due process clause; and even if all this is wrong, still the particular orders ("warrants," as we shall call them) in this case did not satisfy the requirements of the Fourth Amendment's warrant clause.

The trial judge appears, however, to have overlooked *United States v. New York Tel. Co.,* 434 U.S. 159, 168–70, 98 S.Ct. 364, 370–71, 54 L.Ed.2d 376 (1977), where the Supreme Court held that Rule 41 of the Federal Rules of Criminal Procedure, which authorizes the issuance of search warrants, embraces orders to install "pen registers" (devices that record the phone numbers that a telephone subscriber is dialing). See also *Michigan Bell Tel. Co. v. United States,* 565 F.2d 385, 388–89 (6th Cir.1977); *United States v. Hall,* 583 F.Supp. 717, 718–19 (E.D.Va.1984). Although the language of Rule 41 is that of conventional searches (see especially subsection (b)), the Court in the *New York Telephone* case read the rule flexibly and concluded that it covers "electronic intrusions" as well—including bugging. 434 U.S. at 169, 98 S.Ct. at 371 (dictum). We cannot think of any basis on which the rule might be thought sufficiently flexible to

authorize a pen register, bug, or wiretap, but not a camera. It is true that secretly televising people (or taking still or moving pictures of them) while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations. But the fact that electronic eavesdropping is more intrusive than conventional searching did not prevent the Supreme Court in the *New York Telephone* case from reading Rule 41—very broadly in view of its language—to embrace electronic eavesdropping. The next step, to television surveillance, is smaller than the one the Court took.

There is another basis, besides Rule 41, for the issuance of warrants for television surveillance. Like the power to prescribe or regulate procedure, to punish for contempts of court, and to issue writs in aid of the court's jurisdiction, the power to issue a search warrant was historically, and is still today, an inherent (by which we mean simply a nonstatutory, or common law) power of a court of general jurisdiction. Indeed, it is an aspect of the court's power to regulate procedure. A search warrant is often used to obtain evidence for use in a criminal proceeding, and is thus a form of (or at least an analogue to) pretrial discovery. Although Congress can limit the procedural authority of the federal courts—if nothing else, Congress's power to create lower federal courts (Art. I, § 8, cl. 9) so implies—until it does so with respect to a particular subject the courts retain their traditional powers. Rule 57(b) of the Federal Rules of Criminal Procedure virtually so states. And much of federal criminal procedure, especially in the early days of the federal courts, was judge-made. Orfield, *Early Federal Criminal Procedure,* 7 Wayne L.Rev. 503 (1961), gives a number of examples, though none involve search warrants. See *id.* at 529.

In England the inherent judicial power to issue warrants (warrants to seize persons and things and therefore implicitly to search for them) goes back very far—perhaps to the twelfth century. See Baker, An Introduction to English Legal History 15 (2d ed. 1979); Crown Pleas of the Wilt-shire Eyre, 1249, at 75, 92, 98, 100 (Meekings ed. 1961). By the seventeenth century the power was firmly lodged in the justices of the peace. See Dalton, The Countrey Justice 1619, at 300–06 (1972 reprint ed. [1622]); Lasson, The History and Development of the Fourth Amendment to the United States Constitution 36 n. 86 (1937). Hale's History of the Pleas of the Crown (1736) makes clear that the justices of the peace could issue search warrants, provided they were not general warrants. See passages quoted in Scarboro & White, Constitutional Criminal Procedure 21 (1977). As the justices of the peace were not even lawyers, it seems likely that the judges of the royal courts (from which many features of the federal courts were borrowed) had the same power, if little or no occasion to exercise it. A modern American parallel is Rule 41(a) of the Federal Rules of Criminal Procedure, which in terms authorizes only federal magistrates and state-court judges to issue search warrants (see 3 Wright, Federal Practice and Procedure: Criminal 2d, pp. 571–73 nn. 1–7 (1982)) but has been uniformly assumed (for example in the *New York Telephone* case) to empower federal district judges as well to issue search warrants.

Although *Entick v. Carrington,* 19 Howell's State Trials 1029 (C.P. 1765), has been cited for the proposition that statutory authority was required in England for the issuance of search warrants, see, e.g., *United States v. Finazzo,* 583 F.2d 837, 843 (6th Cir.1978), summarily vacated on other grounds, 441 U.S. 929, 99 S.Ct. 2047, 60 L.Ed.2d 657 (1979), the only issue in *Entick* was whether a nonjudicial officer (the secretary of state, described in the opinion as "the king's private secretary," 19 Howell's State Trials at 1046) had common law authority to issue a general warrant to investigate seditious libel. See *id.* at 1063–74. The court held he did not, but did not express doubt about the power of judicial officers to issue particularized warrants. Cf. *Boyd v. United States,* 116 U.S. 616, 629–30, 6 S.Ct. 524, 531–32, 29 L.Ed. 746 (1886); Lasson, *supra,* at 47–49; cf. *id.*

at 34–37, 51–78; Dickerson, *Writs of Assistance as a Cause of the Revolution,* in The Era of the Revolution 40, 75 (Morris ed. 1939).

The power to issue a search warrant is a common law power in America as well as England, see *Adams v. New York,* 192 U.S. 585, 598, 24 S.Ct. 372, 375, 48 L.Ed. 575 (1904); *Boyd v. United States, supra,* 116 U.S. at 623, 6 S.Ct. at 528; *United States v. Maresca,* 266 Fed. 713, 721 (S.D.N.Y. 1920) (Hough, J.), and in the federal system as well as in the states. While "the whole criminal jurisdiction of the courts of the United States [is] derived from Acts of Congress," *Jones v. United States,* 137 U.S. 202, 211, 11 S.Ct. 80, 83, 34 L.Ed. 691 (1890), this does not mean that every procedural incident of their jurisdiction is statutory. Until 1917 there was no general statutory authorization for the issuance of federal search warrants; yet it is hard to believe that before then no warrants were issued outside of the few specific areas (discussed in *United States v. Jones,* 230 Fed. 262, 265–68 (N.D.N.Y.1916)) in which Congress had explicitly authorized their issuance, usually by United States Commissioners. So we are not surprised to have found cases which assume as if it were an uncontroversial proposition that federal courts could issue such warrants before 1917. See *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *In re Jackson,* 96 U.S. (6 Otto) 727, 733, 24 L.Ed. 877 (1878); *Agnello v. United States,* 290 Fed. 671, 677 (2d Cir.1923); but cf. *United States v. Jones, supra,* 230 Fed. at 268. We are only surprised not to have found more such cases.

In 1917 Congress enacted as part of the Espionage Act its first and last general authorization to federal courts to issue search warrants. See 40 Stat. 228–230, 18 U.S.C. §§ 611–633 (1940 ed.). Judging from the committee reports, Congress seems not to have thought it was granting the courts a new power as distinct from creating a procedural framework for the exercise of an old one, cf. H.R.Conf.Rep. No. 65, 65th Cong., 1st Sess. 20 (1917); H.R.Conf.Rep. No. 69, 65th Cong., 1st Sess.

20 (1917), although the floor debates indicate that a number of Congressmen—and the Attorney General of the United States—thought that without the new statute the federal courts would be helpless to authorize search warrants outside of the specific areas covered by previous statutes authorizing search warrants. See 55 Cong. Rec. 1838–39, 2065 (1917).

When Congress overhauled the federal criminal code in 1948, it repealed most of the search-warrant provisions of the Espionage Act, see Notes of Advisory Committee on Fed.R.Crim.Proc. 41, thereby leaving the matter of search warrants to be governed by rule of court. This broad delegation suggests that Congress views the issuance of federal search warrants as standing on a plane with other procedural powers that courts traditionally have exercised without explicit legislative direction. Additional evidence of this is found in the electronic-eavesdropping cases decided by the Supreme Court before the enactment in 1968 of Title III (of which more shortly), which explicitly authorized warrants for electronic eavesdropping. *Osborn v. United States,* 385 U.S. 323, 328–31, 87 S.Ct. 429, 432–34, 17 L.Ed.2d 394 (1966), upheld without mention of Rule 41 a federal court order authorizing a police officer to carry a concealed recording device, and *Katz v. United States,* 389 U.S. 347, 354–56, 88 S.Ct. 507, 512–13, 19 L.Ed.2d 576 (1967), stated that a federal warrant could authorize bugging, and made only a passing reference to Rule 41(d) (execution and return). See *id.* at 355 n. 16, 88 S.Ct. at 513 n. 16. Other authorities for the inherent power of the federal courts to issue search warrants include *United States v. Williams,* 617 F.2d 1063, 1099 (5th Cir.1980) (en banc) (concurring opinion), and *United States v. Yuck Kee,* 281 Fed. 228, 230–31 (D.Minn.1922); see also *United States v. Cafero,* 473 F.2d 489, 499 (3d Cir.1973).

■ We shall not pretend greater certainty than we feel that the federal courts can authorize new types of search without statutory authorization, though *New York*

*Telephone* is powerful authority. The historical evidence we have marshaled is, as so commonly is the case, incomplete and enigmatic; and the floor debates on the 1917 search-warrant provisions are contrary to our position, as is Congress's quick passage of a statute to permit searches for "mere evidence" after the Supreme Court held that the Fourth Amendment did not forbid such searches. See 18 U.S.C. § 3103a; 3 Wright, *supra*, § 664, at pp. 607–08. But a conclusion that neither Rule 41 nor the inherent common law powers of the federal courts allow warrants for television surveillance would have a most curious implication that in combination with all else we have said persuades us to reject it. A search without a warrant certainly is permissible in an emergency, see, e.g., *Welsh v. Wisconsin,* —— U.S. ——, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *Warden v. Hayden,* 387 U.S. 294, 297–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); and a situation in which the FBI had strong reason to believe that an organization was operating a bomb factory but the FBI could not obtain a warrant to conduct the only type of search that would be effective in obtaining necessary evidence of this, because no court had been given authority to issue such a warrant, could fairly be described as an emergency. Therefore the government would have an argument that the fruits of such a search, though it had been conducted without a warrant, would be admissible in the criminal proceeding, provided the search was otherwise reasonable (an important qualification, as we shall see). A holding that federal courts have no power to issue warrants authorizing television surveillance might, therefore, simply validate the conducting of such surveillance without warrants. This would be a Pyrrhic victory for those who view the search warrant as a protection of the values in the Fourth Amendment.

The defendants argue, however, that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, as amended by the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801 *et seq.*, deprives the federal courts of the power they would otherwise have to issue a warrant for television surveillance. Title III authorizes federal judges to issue warrants (called "orders") for wiretapping and bugging, and establishes elaborate requirements for such warrants. See 18 U.S.C. §§ 2516, 2518. But it does not authorize warrants for television surveillance. *People v. Teicher,* 52 N.Y.2d 638, 652, 439 N.Y.S.2d 846, 853, 422 N.E.2d 506, 513 (1981); *Sponick v. City of Detroit Police Dep't,* 49 Mich.App. 162, 198, 211 N.W.2d 674, 690 (1973); Carr, The Law of Electronic Surveillance 124 (1977). The statute regulates only the "interception of wire or oral communications." 18 U.S.C. §§ 2516(1), 2518(1); see also 18 U.S.C. §§ 2511–2513, 2515, 2517, 2519. A man televised while silently making a bomb is not engaged in any form of communication, let alone "wire or oral communication." Any possible doubt on this score is dispelled by the statutory definition of "intercept" as "the *aural* acquisition of the contents of any *wire or oral communication* through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (emphasis added). A visual observation is in no possible sense an "aural acquisition," or an acquisition, of any kind, of a "wire or oral communication." Nor would a camera meet the statutory definition of "electronic, mechanical, or other device." See 18 U.S.C. § 2510(5). The Senate committee report, after repeating the statutory definition of "aural acquisition," remarks: "Other forms of surveillance are not within the proposed legislation." S.Rep. No. 1097, 90th Cong., 2d Sess. 90 (1968), U.S.Code Cong. & Admin.News 1968, 2112, 2178.

It does not follow, however, that because Title III does not authorize warrants for television surveillance, it forbids them. The motto of the Prussian state—that everything which is not permitted is forbidden—is not a helpful guide to statutory interpretation. Television surveillance (with no soundtrack) just is not within the statute's domain. The legislative history does not refer to it, probably because television cameras in 1968 were too bulky and

noisy to be installed and operated surreptitiously. It would be illogical to infer from Congress's quite natural omission to deal with a nonproblem that it meant to tie the federal courts' hands when and if the problem arose.

The defendants appeal to the spirit of Title III, which was, they say, the protection of privacy, and from which they infer that Congress meant to forbid any electronic investigative techniques that it did not authorize. But this description of the spirit of Title III is incomplete. Enacted in the wake of *Katz v. United States, supra,* which had held that electronic eavesdropping was subject to the Fourth Amendment, Title III established procedures to facilitate the use of wiretapping and bugging (subject to appropriate safeguards) in federal criminal investigations. Protecting privacy was a goal of the statute but not the only or even the paramount goal. The Senate report states that "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), U.S.Code Cong. & Admin.News 1968, 2153. The second formulation seems an allusion to the law-enforcement objectives of Title III, elsewhere in the report described as paramount. "[T]he major purpose of title III is to combat organized crime"; and "intercepting the communications of organized criminals is the only effective method of learning about their activities." *Id.* at 70, 72, U.S. Code Cong. & Admin.News 1968, 2157, 2159.

The Foreign Intelligence Surveillance Act establishes procedures for electronic surveillance of foreign agents. Reflecting changes in technology in the decade that had passed since the enactment of Title III, the Act defines electronic surveillance broadly enough to cover television, by including in the definition the use of "an electronic, mechanical, or other surveillance device ... for monitoring to acquire information, other than from a wire or radio

communication ...." 50 U.S.C. § 1801(f)(4); see S.Rep. No. 604, 95th Cong., 2d Sess., pt. 1, at 35 (1977), U.S. Code Cong. & Admin.News 1978, 3904, at 3936. Although the procedures in the Act have no direct application to this case—these defendants are not agents of a foreign power, and the government does not argue that the Act authorized television surveillance of them—the Act also amended Title III as follows: "procedures in [Title III] and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined [in the Foreign Intelligence Surveillance Act], and the interception of domestic wire and oral communications may be conducted." 18 U.S.C. § 2511(2)(f). The defendants read this to mean that television surveillance, a form of electronic surveillance that does not involve the interception of wire or oral communications, may be conducted only in accordance with the Foreign Intelligence Surveillance Act; since that Act did not authorize the surveillance in this case, section 2511(2)(f) forbids it.

All this section means to us, however, is that the Foreign Intelligence Surveillance Act is intended to be exclusive in its domain and Title III in its. The powers that the Act gives the government to keep tabs on agents of foreign countries are not to be used for purely domestic investigations, and conversely the limitations that Title III places on wiretapping and bugging are not to be used to hobble the government's activities against foreign agents. To read the Foreign Intelligence Surveillance Act as the defendants would have us do would give a statute designed to regularize the government's broad powers to deal with the special menace posed by agents of foreign powers the side effect of curtailing the government's powers in domestic law enforcement. This is not what Congress intended in making what the Senate report on the bill that became the Foreign Intelligence Surveillance Act described as a "technical and conforming" amendment to Title III. S.Rep. No. 604, *supra,* at 3.

It is true that the committee reports describe section 2511(2)(f) as the "exclusive congressional statement on the question of the Executive's power to order electronic surveillance," *id.* at 63; see also S.Rep. No. 701, 95th Cong., 2d Sess. 71–72 (1978); H.R.Conf.Rep. No. 1720, 95th Cong., 2d Sess. 35 (1978), U.S.Code Cong. & Admin. News 1978, at 3965, and on this language can be built an argument that Congress intended in section 2511(2)(f) to take away not only the power the courts would otherwise have under Rule 41 or common law principles to issue warrants for television surveillance outside the scope of the Foreign Intelligence Surveillance Act, but also the President's implicit power, deriving from Article II of the Constitution, to use television surveillance for the protection of national security, other than as permitted by that Act. But the background of the quoted language makes this a weak argument. The Foreign Intelligence Surveillance Act is about national security; and much concern was expressed in the debates about the constitutionality as well as the prudence of Congress's displacing by legislation the President's implicit authority under Article II to protect the nation's security against intrigues by foreign powers. See, e.g., 124 Cong.Rec. 28137 (1978) (remarks of Representative Butler). The debate was resolved in favor of the proposed legislation. But the question whether to curtail executive power in domestic criminal investigations was not on the legislative agenda and so far as we can determine was not intended to be answered by the brief discussion in the committee reports of a "technical and conforming" amendment to Title III.

The fact is that Congress has never addressed the issue of judicial authorization of television surveillance in federal criminal investigations. But of course that observation cannot be the end of our analysis. It is too late in the day to argue that the Fourth Amendment regulates only the types of search that were technically feasible in the eighteenth century. The government therefore quite properly does not argue that television surveillance is outside the scope of the Fourth Amendment. We think it also unarguable that television surveillance is exceedingly intrusive, especially in combination (as here) with audio surveillance, and inherently indiscriminate, and that it could be grossly abused—to eliminate personal privacy as understood in modern Western nations.

 The precise application of the Fourth Amendment to television surveillance has, therefore, now to be considered. The Fourth Amendment provides: "[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [2] no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The usual way in which judges interpreting the Fourth Amendment take account of the fact that searches vary in the degree to which they invade personal privacy is by requiring a higher degree of probable cause (to believe that the search will yield incriminating evidence), and by being more insistent that a warrant be obtained if at all feasible, the more intrusive the search is. See, e.g., *Gooding v. United States*, 416 U.S. 430, 464–65, 94 S.Ct. 1780, 1797–98, 40 L.Ed.2d 250 (1974) (dissenting opinion); *United States v. Karo*, —— U.S. ——, 104 S.Ct. 3296, 3304–05, 82 L.Ed.2d 530 (1984). But maybe in dealing with *so* intrusive a technique as television surveillance, other methods of control as well, such as banning the technique outright from use in the home in connection with minor crimes, will be required, in order to strike a proper balance between public safety and personal privacy. Cf. *United States v. Preston*, 468 F.2d 1007, 1010 (6th Cir.1972); *Nueslein v. District of Columbia*, 115 F.2d 690, 696 (D.C. Cir.1940); *Brinegar v. United States*, 338 U.S. 160, 183, 69 S.Ct. 1302, 1314, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting); 1 LaFave & Israel, Criminal Procedure § 3.3, at p. 187 (1984). That question is not before us, but we mention it to make clear that in

declining to hold television surveillance unconstitutional per se we do not suggest that the Constitution must be interpreted to allow it to be used as generally as less intrusive techniques can be used. The first clause of the Fourth Amendment guarantees the right of the American people to be free from unreasonable searches by federal (and by judicial interpretation of the Fourteenth Amendment, state) officers; and a search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law. "[T]here can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967).

But we do not think there can never be a case where secretly televising people in private places is reasonable. The facts of the present case argue against so absolute an approach. The FALN has the plans, the materials, and the know-how to kill in gross. A sophisticated as well as lethal practitioner of urban terrorism, it meets to plan its operations and assemble bombs in safe houses leased under false names. Alert to the possibility that its safe houses might be bugged by the FBI, it takes effective steps to defeat this form of electronic surveillance, making it highly resistant to conventional methods of law enforcement even as enhanced by modern techniques for overhearing conversations. We do not think the Fourth Amendment prevents the government from coping with the menace of this organization by installing and operating secret television cameras in the organization's safe houses. The benefits to the public safety are great, and the costs to personal privacy are modest. A safe house is not a home. No one lives in these apartments, amidst the bombs and other paraphernalia of terrorism. They are places dedicated exclusively to illicit business; and though the Fourth Amendment protects business premises as well as

homes, e.g., *Marshall v. Barlow's Inc.*, 436 U.S. 307, 311–12, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1978), the invasion of privacy caused by secretly televising the interior of business premises is less than that caused by secretly televising the interior of a home, while the social benefit of the invasion is greater when the organization under investigation runs a bomb factory than it would be if it ran a chop shop or a numbers parlor. There is no right to be let alone while assembling bombs in safe houses.

Having concluded that the district court could validly authorize television surveillance in this case, we come to the question whether the two warrants complied with the requirements of the Fourth Amendment's warrant clause. On this aspect of the case the defendants do not argue that the warrants were not issued on the basis of an oath and probable cause, but that they are not particular enough to satisfy the requirements of the Fourth Amendment. (They also make two highly technical objections to the warrants, which we shall take up last.)

The government asked for the warrants in its applications for Title III warrants—applications the government had to make because it wanted to record the sounds in the apartments at the same time that it was televising the interiors—and the warrants it got covered both methods of surveillance. Title III imposes many restrictions on intercept warrants. Those related to the constitutional requirement of particularity are that the judge must certify that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c), and that the warrant must contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates," § 2518(4)(c), must not allow the period of interception to be "longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days" (though re-

newals are possible), § 2518(5), and must require that the interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III]," *id.* Each of these four requirements is a safeguard against electronic surveillance that picks up more information than is strictly necessary and so violates the Fourth Amendment's requirement of particular description. Cf. *United States v. Terry*, 702 F.2d 299, 312 (2d Cir.1983); Carr, *supra*, § 5.07[1] at p. 256.

After stating that there was probable cause to believe both that the individuals named in the warrant were using the specified premises (the safe house) in connection with specified federal crimes and that intercepts of oral and wire communications at this address would yield evidence concerning these crimes, after stating that normal investigative methods had been tried and had failed, and after authorizing intercepts at the address, each of the original warrants in this case went on to authorize the FBI "to install [at the address] devices that will visually monitor and record the activity taking place in furtherance of the above-described [illegal] purposes." Each warrant then specified the number of surreptitious entries that the FBI was authorized to make to install, adjust, and remove both the audio and video equipment (a total of 34 separate entries were authorized), required progress reports to be made to the court every five days, required that the electronic surveillance cease "upon the attainment of the authorized objective," and put a deadline of 30 days on both the audio and video surveillance. One of the warrants was renewed a total of four times, so that it authorized a total of 150 days of surveillance, and the other was renewed twice; and in all, 130 hours of videotape were made. The renewal warrants were essentially identical to the original ones, but were supported by even more compelling showings of probable cause, based on information yielded by the execution of the original warrants.

In short, the warrants complied with all four of the requirements of Title III that implement the constitutional requirement of particularity. In fact, the only requirement of Title III that the government may not have complied with in its television surveillance was the requirement that the application be authorized by the Attorney General or an Assistant Attorney General specially designated by him. See 18 U.S.C. § 2516(1). Actually, the authorization *was* obtained; it just was not communicated to the district judge. We need not decide whether this was a failure to comply with the statute, (nothing in the statute suggests it is); it is in any event not relevant to the Fourth Amendment's requirement of particularity.

A warrant for video surveillance that complies with those provisions that Congress put into Title III in order to implement the Fourth Amendment ought to satisfy the Fourth Amendment's requirement of particularity as applied to such surveillance. Title III was Congress's carefully thought out, and constitutionally valid (see, e.g., *United States v. Ramsey*, 503 F.2d 524, 530–31 (7th Cir.1974); *United States v. Tortorello*, 480 F.2d 764, 772–75 (2d Cir.1973)), effort to implement the requirements of the Fourth Amendment with regard to the necessarily unconventional type of warrant that is used to authorize electronic eavesdropping. In a conventional search the police go through a home or an office looking for contraband or evidence of a crime, and they either find what they are looking for or not, and then they leave. By rummaging through a person's possessions in search of what they came for they invade the person's privacy, and much of what they examine may be at once personal and irrelevant to the objective of the search, but the search is usually brief. Electronic interception, being by nature a continuing rather than one-shot invasion, is even less discriminating than a physical search, because it picks up private conversations (most of which will usually have nothing to do with any illegal activity) over a long period of time. Whether because it is more indiscriminate, or because people regard their conversations as more private

than their possessions, or for both reasons, electronic interception is thought to pose a greater potential threat to personal privacy than physical searches, and Congress therefore pitched the requirements for a valid intercept warrant higher than those for a conventional Rule 41 warrant: except for probable cause, the requirements in 18 U.S.C. § 2518 are not found in Rule 41. Television surveillance is identical *in its indiscriminate character* to wiretapping and bugging. It is even more invasive of privacy, just as a strip search is more invasive than a pat-down search, but it is not more indiscriminate: the microphone is as "dumb" as the television camera; both devices pick up anything within their electronic reach, however irrelevant to the investigation. If the government conducts television surveillance in conformity with the requirements of particularity that Title III imposes on electronic eavesdropping (not literal conformity, of course, since words such as "communications" and "intercept" in Title III do not fit television surveillance), the government has also conformed to the requirement of particularity in the Fourth Amendment's warrant clause.

Since the government did this here, we need not, strictly speaking, decide what would happen if it had not done so. But because television surveillance is potentially so menacing to personal privacy, we want to make clear our view that a warrant for television surveillance that did not satisfy the four provisions of Title III that implement the Fourth Amendment's requirement of particularity would violate the Fourth Amendment. Invoking our common law power to interpret the Constitution in a novel context, we borrow the warrant procedure of Title III, a careful legislative attempt to solve a very similar problem, and hold that it provides the measure of the government's constitutional obligation of particular description in using television surveillance to investigate crime. We doubt that the government will resist this view, for there will be few if any cases where it does not try anyway to conform its application for a television-surveillance warrant to Title III. It wants the sounds as well as the sights, and it can get a warrant for the former only by complying with Title III; the soundtrack of a videotape, no less than a free-standing tape recording, is within the scope of Title III, as assumed in *United States v. Haimowitz*, 725 F.2d 1561, 1581 and n. 28 (11th Cir. 1984).

But we are unwilling to go further and hold that warrants for television surveillance are subject to Title III, as warrants for bugging and wiretapping are, so that if for example a television-surveillance warrant was destroyed without an order by the issuing judge, the person destroying it could be punished for contempt under 18 U.S.C. § 2518(8)(c), a provision of Title III that punishes unauthorized destruction of intercept warrants. It is only the requirements (listed earlier) of Title III that implement the constitutional requirement of particularity in the novel setting of electronic surveillance that we have borrowed to give content to the Fourth Amendment as applied to television surveillance. Of course it is anomalous to have detailed statutory regulation of bugging and wiretapping but not of television surveillance, in Title III, and detailed statutory regulation of television surveillance of foreign agents but not of domestic criminal suspects, in the Foreign Intelligence Surveillance Act; and we would think it a very good thing if Congress responded to the issues discussed in this opinion by amending Title III to bring television surveillance within its scope. But judges are not authorized to amend statutes even to bring them up to date. True, when statutes are ambiguous and judges interpret them in light of altered conditions, the result is very like amendment. "When a judge tries to find out what the government would have intended which it did not say, he puts into its mouth things which he thinks it ought to have said, and that is very close to substituting what he himself thinks right. Let him beware, however, or he will usurp the office of government, even though in a small way he must do so in order to exe-

cute its real commands at all." L. Hand, *How Far Is a Judge Free in Rendering a Decision?,* in The Spirit of Liberty 103, 108 (Dilliard 3d ed. 1960 [1935]). Judge Hand's warning about judicial usurpation is apt here. When Congress has indicated the domain of a statute as clearly as it did when it enacted Title III, we cannot apply the statute outside its domain merely because we are confident that if Congress had known then what we know now it would have used more general language. Congress said in language that could not be clearer that Title III is about the interception of wire and oral *communications* and that interception means *aural* acquisition. There is no way in which these words can be read to include silent television surveillance; and the legislative history quoted earlier indicates that the exclusion from the scope of the statute of other methods of surveillance besides those defined in the statute was deliberate. Statutory language, to be stretchable, should be elastic. This statutory language is not. To read the words of this statute—intercept, aural, communication—as if they encompassed silent visual surveillance would be to say to Congress that there is no form of words that it can use to mark off the limits of a statute that will prevent aggressive, imaginative judges from disregarding those limits. And we naturally shrink from saying any such thing.·

If Title III and the Foreign Intelligence Surveillance Act were inconsistent, then we would have to make a choice, and in doing so we might unavoidably be exercising something resembling a legislature's discretion. But there is no inconsistency. The two statutes govern nonoverlapping domains. And television surveillance for domestic criminal investigations is in neither statute's domain. No doubt this is, as we have said, anomalous; it may seem fairly to cry out for congressional attention; but it does not create ambiguity as to the legal duties under which the government labors in conducting television surveillance of domestic criminal suspects. The only legal duties are those imposed by the Fourth Amendment. And we therefore go as far as is proper for us to go when we use a part of Title III to give meaning to the Fourth Amendment's requirement of particularity as applied to television surveillance. Since the Fourth Amendment has long been held fully applicable to the states through the Fourteenth Amendment, state and local officers who might want to use television surveillance in criminal investigations will be under the same restraints as we impose on federal officers today.

■■■ The defendants complain, finally, that the warrants in this case did not explain the basis of the judge's finding of probable cause and did not identify as safe houses the addresses at which the surveillance was to be conducted. This complaint misapprehends the purpose of a search warrant, which is twofold: to show that a judicial officer authorized the search (cf. *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436 (1948)), and to indicate to the government agents who will execute the warrant what the limits of the authorization are (cf. *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). A warrant is not a judicial opinion, and the basis for the warrant is not in the warrant itself; as Rule 41(c)(1) makes clear, it is in the application for the warrant. The application in this case set forth in full and convincing detail the reasons for thinking that the addresses where the surveillance was to be conducted were FALN safe houses, that normal investigative methods would be unavailing, and that television surveillance was an appropriate supplement to electronic eavesdropping. The truth of the recitals in the applications is not controverted, and they provided an adequate factual basis for the warrants.

The order of suppression is reversed and the case remanded for trial.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, concurring in the result.

I am in complete accord with the majority's conclusion that "[t]here is no right to

be let alone while assembling bombs in safe houses." It is hard to imagine facts stronger than those before us to justify means of surveillance necessary to protect the public. No society may be lightly presumed to have denied itself the means necessary to defend itself against this kind of assault.

If there were no Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 82 Stat. 197, 212, codified primarily as chapter 119 of 18 U.S.C., and no Foreign Intelligence Surveillance Act of 1978 ("FISA"), Pub.L. 95–511, 92 Stat. 1783, codified primarily as chapter 36 of 50 U.S.C., I would have no great difficulty in this case in following the majority down the path of inherent powers (fortified by Rule 41 of the Federal Rules of Criminal Procedure). That route has considerable appeal where, as here, we are apparently responding to the threat of a war to be waged randomly against the populace. But given the existing statutory scheme, that route is, I think, neither necessary nor justifiable.

I believe that, if Title III and FISA are construed together, it is possible and desirable to find in them not only the authority to conduct video surveillance in appropriate circumstances but a procedure which brings authorization of, and responsibility for, such surveillance under centralized and high-level control. Considering the potential of video surveillance to lend dreadful substance to the Orwellian concerns noted by the majority, we should be extremely reluctant to permit this sort of activity free of the statutory safeguards provided by Congress for less intrusive police activities. And it is not as difficult, apparently, for me to find a basis for application of the safeguards of Title III and FISA as it is for the majority. In that connection, it is worth repeating that while

> [i]t is not the judge's job to keep a statute up to date in the sense of making it reflect contemporary values[,] it is his

job to imagine as best he can how the legislators who enacted the statute would have wanted it applied to situations they did not foresee.

Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U.Chi.L.Rev. 800, 818 (1983). This court itself has recently recognized that

> [t]he judicial duty of statutory interpretation is not a duty merely to read; it is a duty to help the legislature achieve the aims that can reasonably be inferred from the statutory design, and it requires us to pay attention to the spirit as well as the letter of the statute.

*United States v. Markgraf*, 736 F.2d 1179, 1188 (7th Cir.1984) (Posner, J., dissenting from denial of rehearing *en banc*). If these injunctions require one to be—in the words of the majority—"aggressive" and "imaginative," then so be it.

In my view, a careful evaluation of Title III and FISA, and of the interplay between those two statutes, shows that the video surveillance in this case should be subject to the requirements of Title III. Neither party now advocates this position, but it appears to have been the government's position when it sought the court orders here and it was Judge McGarr's approach when he issued the orders.[1]

The foundation of my position is that Title III must be construed together with FISA, and that it is clear that Congress intended the statutes to be read together, providing a comprehensive and exclusive system of control. *See* S.Rep. No. 604, 95th Cong., 1st Sess. 3, 6, 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3904, 3907, 3916–17 (Judiciary Comm.); *see also* S.Rep. No. 701, 95th Cong., 2d Sess. 71, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3973, 4040 (Intelligence Comm.). The two statutes are written to impose a comprehensive regulatory scheme on the use of electronic surveillance in the United States whenever there is a reasonable expectation of privacy. Title III was enacted to govern domes-

---

1. *See* Initial Buena Application at 6, Gov't App. at 101; Initial Lunt Application at 5, Gov't App. at 232; Transcript of Initial Buena Application Order Proceedings before Judge McGarr, January 18, 1983, at 2–3, Gov't App. at 223–24.

tic surveillance activity, and as enacted in 1968 it expressly exempted from its provisions electronic surveillance for national security purposes. Section 802, Pub.L. 90–351, 82 Stat. 197, 213, *codified as* 18 U.S.C. § 2511(3), *repealed by* § 201(c) of FISA. In 1978, Congress responded to concerns about the abuse of that national security exemption by enacting FISA. S.REP. No. 604, 95th Cong., 1st Sess. 7, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3904, 3908. FISA repealed the exemption and declared that the executive branch does not have inherent authority to undertake electronic surveillance even in national security and counterintelligence cases. S.REP. No. 604, 95th Cong., 1st Sess. 6, 64, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3904, 3907, 3965; S.REP. No. 701, 95th Cong., 2d Sess. 71, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3973, 4040. Instead, FISA created a new set of procedures and substantive requirements which would subject such surveillance to judicial control while still protecting national security. Several provisions of FISA make it unmistakably clear that government (federal, state and local) may not use highly intrusive forms of electronic surveillance unless it does so in accordance with either Title III or FISA. *E.g.* 18 U.S.C. § 2511(2)(f) (codifying § 201(b) of FISA); 50 U.S.C. § 1809 (codifying § 109 of FISA). Unless those statutes are complied with, law enforcement officers who engage in these forms of surveillance may very well be committing a federal crime. 50 U.S.C. § 1809.

The basic problem in the case before us stems from the fact that FISA explicitly addresses the problem of video surveillance, while Title III does not. The majority errs in concluding that the government may engage in the video surveillance in this case without regard to any statutory regulation of such surveillance. In doing so, the majority ignores unequivocal provisions of FISA, and of Title III as amended by FISA, and disregards the clear purpose of both statutes to subject intrusive forms of electronic surveillance to strict statutory control.

The key statutory provisions here are 18 U.S.C. § 2511(2)(f), enacted as section 201(b) of FISA, and 50 U.S.C. § 1809, enacted as section 109 of FISA. Section 2511(2)(f) of title 18, U.S.C., provides in relevant part:

[P]rocedures in this chapter and the Foreign Intelligence Surveillance Act of 1978 *shall be the exclusive means* by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire and oral communications may be conducted. (emphasis supplied)

This provision incorporates the FISA definition of "electronic surveillance" found in 50 U.S.C. § 1801(f). Subparagraph 4 of that subsection defines "electronic surveillance" as

the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

That language is obviously broad, and, read literally, certainly includes video surveillance. There is no doubt that the miniaturized cameras used in this case are "electronic devices" used "to acquire information" under circumstances in which the subjects had a reasonable expectation of privacy. And when we turn to the relevant committee reports on FISA, we learn that Congress did in fact intend the quoted language to cover such video surveillance equipment. S.REP. No. 604, 95th Cong., 1st Sess. 35, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3904, 3936; S.REP. No. 701, 95th Cong. 2d Sess. 37, *reprinted in* 1978 U.S. CODE CONG. & AD.NEWS 3973, 4006. The Senate Judiciary Committee Report on FISA explains that that subparagraph "could also include miniaturized television cameras and other sophisticated devices not aimed merely at communications." S. REP. No. 604, 95th Cong., 1st Sess. 35, *reprinted in* 1978 U.S.CODE CONG. & AD. NEWS 3904, 3936. The next sentence of the

report says "[t]his part of the definition is meant to be broadly inclusive, because the effect of including a particular means of surveillance is not to prohibit it but to subject it to judicial oversight." *Id.* The Senate Intelligence Committee Report on the bill includes the same language. *See* S. REP. No. 701, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3973, 4006.

Thus, it is clear that video surveillance falls within the FISA definition of electronic surveillance. Therefore, 18 U.S.C. § 2511(2)(f) may be paraphrased to say that the "procedures in this chapter and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance—including video surveillance—may be conducted." In short, if the video surveillance employed in this case was not expressly authorized by either Title III or FISA, then it would be prohibited by law. Subsection 2511(2)(f) cannot be contorted into meaning that Title III governs one thing, FISA governs another, and anything not governed by one or the other is permitted, as the majority would have it.

In addition, if the video surveillance here was not authorized by statute, then the officers who engaged in it may have committed a federal crime. Section 109(a) of FISA, 50 U.S.C. § 1809(a), provides in relevant part: "A person is guilty of an offense if he intentionally—(1) engages in electronic surveillance under color of law except as authorized by statute ...." Again, the FISA definition of "electronic surveillance" applies to this provision, and as shown above, that definition includes video surveillance such as that used in the case before us.[2] Section 1809 thus requires the government to show *statutory* authorization for its use of video surveillance, and the only possible sources of that authority are Title III and FISA.

But my reasons for disagreeing with the majority are not limited to the statutory language. By leaving an extraordinarily intrusive form of domestic electronic surveillance uncontrolled by statute, the majority acts contrary to the purposes of both statutes and produces a highly improbable result.

This most improbable result may be described in the following way. Based on the definition of "electronic surveillance" in FISA, 50 U.S.C. § 1801(f)(4), any attempt to employ video surveillance in a foreign intelligence case would be subject to FISA's restrictions. In these highly sensitive cases of perhaps extraordinary importance to the nation, video surveillance may be employed only with the approval of officials at the highest levels of the federal government and of a special court established for this purpose in 50 U.S.C. § 1803. To be more precise, the application must be approved by the Attorney General or Deputy Attorney General of the United States, 50 U.S.C. § 1804(a); and the need for using such intrusive surveillance measures must be certified by the President's national security affairs adviser or a national security official whose appointment is subject to Senate confirmation, 50 U.S.C. § 1804(a)(7). Only then may the government apply to the special court for a warrant. And FISA imposes numerous other requirements designed to ensure that highly intrusive surveillance measures are used only when and to the extent necessary. See the remainder of § 1804(a).

In sharp contrast to these extraordinary statutory requirements for the use of video surveillance in foreign intelligence cases, the majority would leave video surveillance in all domestic law enforcement cases subject only to a few *ad hoc* constraints. In this respect, the majority seeks to solve the policy problem of its anomalous position by adopting in dicta some of the requirements of Title III as matters of constitutional

---

**2.** Of course, subsection (b) of the section (50 U.S.C. § 1809(b)) provides a defense for officers with a search warrant or court order, so the officers in the matter before us presumably would not be in jeopardy. By finding that courts have the power to issue warrants for video surveillance, even though not authorized by statute, the majority effectively eviscerates this criminalizing provision.

law.[3] There is no persuasive authority for this and, as a matter of judicial aggressiveness, it seems to me more egregious than a mere act of statutory interpretation. In any event, the constitutional requirements, which the majority imposes here by way of dicta can be, I suppose, just as easily interpreted away in the next case. I think it preferable to follow the mandates of 18 U.S.C. § 2511(2)(f) and 50 U.S.C. § 1809 and leave the matter to Congress.

Although there is no explicit mention of video surveillance techniques anywhere in Title III or in its legislative history, it is virtually inconceivable that the Congress which enacted Title III would have, if it had ever considered the question directly, left video surveillance unregulated by statute. The relevant committee reports and comments of individual members of Congress reflect quite clearly the process of balancing individual privacy concerns and the fight against organized crime. S.REP. No. 1097, 90th Cong., 2d Sess. 67–69 (state of the law), 70–76 (balance between privacy and control of organized crime), *reprinted in* 1968 U.S.CODE CONG. & AD.NEWS 2112, 2154–56, 2157–63. The Johnson Administration and numerous members of Congress supported a total prohibition on wiretapping and electronic bugging, believing that the techniques would add relatively little in fighting crime and that the threat to privacy, especially if the techniques were abused, was too great to tolerate. S.REP. No. 1097, 90th Cong., 2d Sess. 161–62, 172–73 (Johnson Administration supported *ban* on wiretaps and bugging), *reprinted in* 1968 U.S.CODE CONG. & AD.NEWS 2112, 2223–24, 2233–34. The proponents of Title III argued that the statute struck a correct balance between law enforcement and privacy interests. S.REP. No. 1097, 90th

Cong., 2d Sess. 186–87 (individual views of Sen. Bayh), 214–18 (individual views of Sen. Scott), 220 (individual views of Senator Eastland), 224–26 (minority statement), *reprinted in* 1968 U.S.CODE CONG. & AD.NEWS 2112, 2245–46, 2264–68, 2270, 2274–75. The only members of Congress who expressed opposition to Title III on the grounds that its provisions unduly restricted surveillance were several Senators who argued that the statute should not apply to state officials. S.REP. No. 1097, 90th Cong., 2d Sess. 238–39 (individual views of Sens. Dirksen, Hruska and Thurmond), *reprinted in* 1968 U.S.CODE CONG. & AD.NEWS 2112, 2288–89.

Further, the committee reports reviewed the state of the law at the time and expressed deep dissatisfaction with the contemporary protection of individual privacy interests. S.REP. No. 1097, 90th Cong., 2d Sess. 67–69, 162–64 (individual views of Sens. Long and Hart), 166–70 (additional views of Sen. Hart), *reprinted in* 1968 U.S. CODE CONG. & AD.NEWS 2112, 2154–56, 2224–26, 2227–31. The reports discussed at some length the Supreme Court's then-recent decisions in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and while they argued that Title III was constitutional, the reports also pointed out the inadequacies of then-applicable constitutional law decisions in protecting privacy. S.REP. No. 1097, 90th Cong., 2d Sess. 66–76, *reprinted in* 1968 U.S.CODE CONG. & AD. NEWS 2112, 2153–63. *But see id.* at 166–70 (additional views of Sen. Hart), *reprinted in* 1968 U.S.CODE CONG. & AD.NEWS 2112, 2227–31.

The clearest indications of this dissatisfaction are the statutory requirements

---

**3.** The majority, however, imposes only four Title III requirements (at least insofar as dicta impose requirements), and these are not some of the most efficacious provisions. The majority does not require that only the Attorney General or a designated Assistant Attorney General authorize federal applications, § 2516(1), or that only the principal prosecuting attorney of a state (or of a political subdivision of a state if so authorized by state law) may apply for a state order, § 2516(2). Thus, control over authorization is not centralized, and the power to apply for video surveillance orders is left in the hands of local law enforcement personnel. Nor does the majority impose the requirements of § 2516(1) & (2) which limit surveillance to the investigation of specified crimes. Further, the majority does not impose the strict statutory exclusionary rule of §§ 2515 and 2518(10)(a).

which seem to go far beyond anything the Constitution demands. Those statutory limitations and requirements include the following restrictions:

(1) bugging and wiretapping are permitted only when investigating specified crimes, 18 U.S.C. § 2516(1) & (2);

(2) authorization for bugging and wiretapping requests must be centralized in each jurisdiction so as to prevent local abuses and to make an identifiable person answerable for abuses, §§ 2516(1) & (2), 2518(1)(a);

(3) there is a statutory exclusionary rule for information obtained in violation of Title III, and that rule is broader than the constitutional exclusionary rule as it existed in 1968, let alone now, §§ 2515, 2518(10)(a);

(4) bugging and wiretapping must, in many instances, be disclosed to the targets after the investigation is concluded, § 2518(7) & (8)(d);

(5) police officers engaging in warrantless wiretapping or bugging are subject to criminal penalties, § 2511(1);

(6) targets of unlawful wiretapping and bugging have a private cause of action for damages, § 2520;

(7) the statutory requirements for minimizing obtrusiveness are much more specific than the Constitution requires, § 2518(1)(b) & (5); and

(8) bugging and wiretapping are permitted only when the government can show that conventional, less intrusive investigation techniques have proven or are very likely to prove unsuccessful, § 2518(1)(c) & (3)(e).

In 1968 Congress enacted Title III in part because audio surveillance was so intrusive that its use had to be subjected to stringent statutory limitations. It is self-evident that the continuous video surveillance in the case before us is more intrusive by a wide margin. The combination of video and audio surveillance here let the government detect every sound, every word and every gesture—everything except the targets' unexpressed thoughts. Difficult as it may be to place ourselves in the position of Congress and accurately divine what it would have done in considering this new situation, we can say with some confidence what Congress would *not* have done. It would not have left video surveillance unregulated by statute if it had permitted it at all. In light of the political give and take on Title III, the flow of the debate, the way Congress arranged its agenda, the central competing policy concerns of proponents and opponents, we can say with confidence that Congress, if it had explicitly considered the prospect of video surveillance, would not have left it free of the constraints imposed on audio and wire surveillance. Yet the majority here does so, leaving the far more intrusive video techniques essentially subject only to a few *ad hoc* constitutional requirements which, by comparison, are ropes of sand.

The provisions and legislative history of the Foreign Intelligence Surveillance Act, enacted in 1978, lend additional support to this conclusion. FISA includes within its definition of "electronic surveillance" the use of video devices such as those used in the present case. 50 U.S.C. § 1801(f)(4); S. REP. No. 604, 95th Cong., 1st Sess. 35, *reprinted in* 1978 U.S.CODE CONG. & AD. NEWS 3904, 3936; S.REP. No. 701, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S. CODE CONG. & AD.NEWS 3973, 4006.

FISA applies to investigations of special, and in some cases, extraordinary importance to the nation. *See* S.REP. No. 604, 95th Cong., 1st Sess. 9, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3904, 3910. As was the case with Title III, the congressional debate was focused on achieving a correct balance, in this instance between privacy interests and national security. *See* S.REP. No. 604, 95th Cong., 1st Sess. 7–9, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3904, 3908–10; S.REP. No. 701, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 3973, 3985. In 1978 Congress was willing to authorize the use of these extremely intrusive video surveillance devices, but only subject to conditions which are, in some ways, even more strict than those contained in Title III. For

example, only the Attorney General or Deputy Attorney General may apply for a court order under 50 U.S.C. § 1804(a). The need for the surveillance and its relation to foreign intelligence must be certified by the President's adviser for national security affairs or by a national security official whose appointment is subject to Senate confirmation. § 1804(a)(7).[4] The statute draws on Title III as its model on issues of necessity and minimization, and imposes those more stringent non-constitutional requirements. § 1805(b) & (d). The surveillance must be carried out subject to court order and supervision, S.REP. No. 604, 95th Cong., 1st Sess. 16, *reprinted in* 1978 U.S. CODE CONG. & AD.NEWS 3904, 3917–18, and the court is a special one selected by the Chief Justice of the United States, § 1803(a), to develop expertise in the subject matter and to impose some controls on the executive branch in conducting this type of surveillance. S.REP. No. 604, 95th Cong., 1st Sess. 16, *reprinted in* 1978 U.S. CODE CONG. & AD.NEWS 3904, 3917. The court operates in secret but it is still an Article III court with the authority to deny permission for surveillance.

Congress was so concerned about potential abuses of these investigative techniques in foreign intelligence cases that it imposed these numerous requirements—checks and balances affecting officials at the highest levels of government. It imposed those requirements in cases of utmost importance and sensitivity to national security. I am unpersuaded by the suggestion that Congress could have subjected these techniques to such tight controls in those cases and still left open the use of the same techniques for every local police department in every minor investigation. The majority's interpretation would presumably give the power to engage in this

intrusive video surveillance to virtually any officer with a badge and to any official with a robe and gavel. In fact, the majority runs the risk of leaving open the use of video surveillance with such relatively loose controls in every case *except* those of greatest importance. According to the majority, Congress entrusted powers to a deputy sheriff and half-time magistrate on a local gambling investigation that it expressly denied the director of the Federal Bureau of Investigation and a special expert court in foreign intelligence cases of the utmost sensitivity and importance. This result is irrational and contrary to Congressional intent. If statutory language must be bent, as the majority must bend the language of 18 U.S.C. § 2511(2)(f) and 50 U.S.C. § 1809, we should at least bend it in the general direction of Congressional purpose and method.

The defendants make a plausible argument, based on the statutory language, for a third interpretation of FISA and Title III, under which video surveillance is prohibited except in foreign intelligence cases.[5] I cannot dismiss defendants' argument out of hand; indeed I have argued consistently with it that FISA and Title III are constructed to provide a comprehensive framework for the use of electronic surveillance in the United States in situations where the targets have a reasonable expectation of privacy. Under that scheme the government's use of video surveillance in this case was illegal if it was not authorized either by FISA or by Title III.

It is obvious that the government's video surveillance here was not authorized under FISA. The FALN is not a "foreign" target within the meaning of FISA and the government made no attempt to employ

4. There are special limited provisions for warrantless surveillance under very narrow circumstances on orders of the President and certification by the Attorney General. 50 U.S.C. § 1802(a).

5. A similar argument, that the absence of provisions in Title III for video surveillance implies that such surveillance is forbidden, has been rejected as giving too little weight to Congres-

sional concerns. *In re Application for Order Authorizing Interceptions of Oral Communications and Videotape Surveillance,* 513 F.Supp. 421, 422 (D.Mass.1980) (allowing video surveillance where substantive safeguards at least as rigorous as those required by Title III, if not more so, had been observed). The effect of FISA on Title III was not considered.

FISA procedures. Therefore, either Title III must apply or the video surveillance was unlawful.

But the defendants argue that Title III cannot authorize video surveillance because that statute is limited to audio and wire surveillance, as appears in the language of 18 U.S.C. §§ 2510 and 2511.[6] This language, in particular the definition of "intercept" contained in 18 U.S.C. § 2510(4), does indeed pose the principal obstacle to reaching my conclusion. That definition states: "'intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." On its face, this definition appears to restrict Title III to audio surveillance techniques, and courts have construed the definition as limited to devices which acquire information through the sense of hearing. *E.g., United States v. New York Tel. Co.,* 434 U.S. 159, 165–68, 98 S.Ct. 364, 368–70, 54 L.Ed.2d 376 (1977) (pen registers); *United States v. Cassity,* 546 F.Supp. 611, 621 (E.D.Mich.1981) (beepers), *rev'd in part, on other grounds,* 720 F.2d 451 (6th Cir.1983), *vacated* — U.S. ——, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984) (mem.). Three courts have specifically held Title III not applicable to video surveillance. *In re Application for Order Authorizing Interception of Oral Communications and Videotape Surveillance,* 513 F.Supp. 421 (D.Mass.1980); *People v. Teicher,* 52 N.Y.2d 638, 439 N.Y.S.2d 846, 422 N.E.2d 506 (1981); *Sponick v. City of Detroit Police Dept.,* 49 Mich.App. 162, 211 N.W.2d 674 (1973).

There are, however, several reasons why we should not adhere blindly to those prior constructions. First, the prior court constructions have, with certain exceptions, in-

volved efforts by defendants to extend Title III to relatively *less* intrusive surveillance devices such as pen registers, which record telephone numbers dialed by a monitored telephone. *See New York Telephone, supra,* and cases cited therein 434 U.S. at 166 n. 9, 98 S.Ct. at 369 n. 9; *Cassity, supra.* Courts have with good reason relied on both the language of the statute and the legislative history to resist extensions of Title III to these less intrusive surveillance methods. The definition of "intercept" in Title III is carefully worded, but its sharp focus on the "aural" acquisition of information was designed to avoid including *less* intrusive surveillance devices. S.Rep. No. 1097, 90th Cong., 2d Sess. 90, *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2178. The use of the word "aural" had the effect of limiting Title III to those highly intrusive electronic surveillance measures, such as wiretapping and bugging, which could disclose the *contents* of communications. *Id.*

The question we face here, by contrast, is one which the definition of "intercept" was not framed to address. We are dealing with a far more intrusive surveillance technique, and one that surely has the effect of revealing the contents of communications together with a vast amount of other information about targets. Careful wording does not require us to reach irrational results when facing a question not contemplated by the drafters of the definition merely because other courts have reached those results in a different context.

In addition, whatever the scope of Title III before 1978, the enactment of FISA in 1978 provides a sound basis for extending Title III to encompass video surveillance.[7]

---

**6.** Both the majority and the government agree, though they draw a different conclusion than do the defendants.

**7.** None of the courts which have said Title III is limited to information acquired through the sense of hearing has considered the complicated effects of the 1978 FISA statute, which quite clearly does cover video surveillance. *E.g. United States v. New York Tel. Co.,* 434 U.S. 159, 165–68, 98 S.Ct. 364, 368–70, 54 L.Ed.2d 376 (1977) (pen registers); *United States v. Cassity,*

546 F.Supp. 611, 621 (E.D.Mich.1981) (beepers), *rev'd in part, on other grounds,* 720 F.2d 451 (6th Cir.1983), *vacated* — U.S. ——, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984) (mem.). Nor have the effects of FISA on Title III been considered by the three courts which have held Title III inapplicable to video surveillance. *In re Application for Order Authorizing Interception of Oral Communications and Videotape Surveillance,* 513 F.Supp. 421 (D.Mass.1980); *People v. Teicher,* 52 N.Y.2d 638, 439 N.Y.S.2d 846, 422 N.E.2d

Because FISA was intended to mesh with Title III in a comprehensive statutory system for regulating highly intrusive forms of electronic surveillance, it included a number of "conforming amendments" to prevent various statutory anomalies or conflicts which might otherwise have arisen.[8] Some of those conforming amendments expressly introduced the FISA definition of "electronic surveillance" (including its video dimension) into some sections of Title III. *E.g.,* FISA § 201(a), amending 18 U.S.C. § 2511(2)(a)(ii) (authorizing a common carrier to assist an agent with a court order authorizing the interception of wire or oral communications or electronic surveillance as defined in FISA).

The inclusion of video surveillance in FISA's definition of electronic surveillance is relatively obscure and becomes explicit only in a few sentences buried in the committee reports. Congress' attention was clearly elsewhere with regard to FISA. And it seems evident to me that the potential problems of either the majority position or the defendants' position were simply not recognized in the development of one complicated statute and its integration with another complicated statute. Either result—the exemption of video surveillance from any statutory regulation or the prohibition of video surveillance—is extreme enough to persuade me that Congress, if it had noticed the possibility, would at least have commented on it somewhere. Instead, there is silence.

In view of the language of both Title III and FISA, the purposes of both statutes, the practical connections between audio and video surveillance methods and the silence in the legislative history on the subject, it is most sensible to view the statutory dilemma as the result of inadvertence rather than design. FISA's "conforming amendments" simply did not mesh the gears of the statutes quite as smoothly as Congress had intended.

There is a further difficulty with the defendants' argument. If Congress chose to prohibit video surveillance, it chose a remarkably roundabout and subtle way to do it, and it never indicated clearly any intention to do so. In fact, neither Title III nor FISA *prohibits any* specific surveillance method. Instead, both statutes are designed to *control* intrusive methods of electronic surveillance by regulating their use. There is no indication in the language or legislative history of either statute that Congress meant to outlaw *any* form of surveillance, and I think it quite implausible that Congress—faced with a situation such as confronts us—would have prohibited surveillance in almost any form.

Although the defendants' argument is certainly not frivolous, and, indeed, tracks the statutory language more closely than the interpretations offered in this and the majority opinions, we should, in order to avoid absurd results, construe Title III to apply to video surveillance for domestic law enforcement investigations where the targets of the surveillance have a reasonable expectation of privacy, as in this case.

As a practical matter, the procedural and substantive requirements of Title III are compatible with video surveillance in every respect, and video surveillance is likely to be used only in tandem with audio surveillance techniques already subject to Title III. The same application, the same authorization, the same showing of probable cause, the same showing of need for such intrusive measures would all apply equally to both video and audio surveillance methods. And, of course, that is essentially the

---

506 (1981); *Sponick v. City of Detroit Police Dept.,* 49 Mich.App. 162, 211 N.W.2d 674 (1973). Several of the cases relied on by the majority, including *New York Telephone* and *Sponick,* were decided prior to the enactment of FISA. And in *In re Application,* Judge Keeton allowed video surveillance only after forcing the government to go through Title III application procedures and subjecting the surveillance to substantive safeguards at least as rigorous as those

required by Title III. *In re Application,* 513 F.Supp. at 423.

**8.** These undesirable effects included such possible results as holding federal agents criminally liable under 18 U.S.C. § 2511 for acting in accordance with a court order under FISA. *See* FISA § 201(b).

course the government pursued here in its applications, including a request for video surveillance as part—albeit as only one sentence—of routine Title III applications.[9] Thus, the details of the Title III regulatory scheme appear to be compatible in every respect with video surveillance as a supplement to audio surveillance.

Further, the application of Title III to video surveillance seems to me to be most closely in accord with Congress' intent in Title III and FISA. Congress was troubled by the potential for abuses of electronic surveillance, and was dissatisfied with the adequacy of the contemporary constitutional doctrine for the protection of privacy interests. The purpose of these two statutes was not to outlaw electronic surveillance but to subject it to rigorous controls. A key element of both Title III and FISA is that each centralizes authority *and responsibility* for the use of intrusive means of electronic surveillance. Congress was quite concerned in Title III to prevent the possibility of local or relatively low-level officials using or abusing their power by employing electronic surveillance for their own purposes, or where it was otherwise unwarranted. There is of course no guarantee that high level officials will not also abuse their power, but Title III was designed to make it easy to assign responsibility for abuses and to provide for rational and consistent policies in the use of these highly intrusive measures. All of these concerns apply with *at least* as much force to video as to audio surveillance and it makes the utmost sense to apply those constraints to video surveillance as well.

Of course, this is open to criticism as an aggressive exercise in statutory construction, and if either of the alternatives were more consistent with *both* statutes and their purposes and legislative histories, I would perhaps retreat from my interpretation. However, each alternative has technical and policy problems which are, in my view, considerably more severe than my

bending of the Title III language. If my construction were to be chastised as "result oriented," I would assert that it seeks a result which is both sensible and consistent with both the statutes and the legislative histories read carefully and as a whole. Applying Title III to video surveillance avoids the majority's anomaly of subjecting the most dangerously intrusive form of electronic surveillance to much less control[10] than other forms. In addition, the majority's interpretation subjects video surveillance to much less control in the investigation of a local gambling parlor than in foreign intelligence investigations. My construction also avoids the improbable result of reading Title III and FISA as prohibiting one particular form of electronic surveillance when there are no indications anywhere that Congress meant to prohibit any surveillance technique in all situations. Instead, my approach subjects this highly intrusive form of surveillance to at least as much constraint as less intrusive forms are subject to, and it accords with the general congressional design of closely regulating—not prohibiting—these somewhat awesome forms of surveillance.

---

**9.** This course was also taken by the government, though after some prodding by Judge Keeton, in *In re Application, supra.*

