UNITED STATES of America, Plaintiff,

v.

Nazareth ANDONIAN, et al., Defendants.

No. CR 89–190–WDK.

United States District Court, C.D. California.

April 10, 1990.

Robert L. Brosio, U.S. Atty., and Russell Hayman and Jean A. Kawahara, Asst. U.S. Attys., for plaintiff.

Stanley Greenberg, Los Angeles, Cal., for Nazareth Andonian.

Jerry L. Newton, Hermosa Beach, Cal., for Vahe Andonian.

Martin L. Schmukler, New York City, for Raul Vivas.

David Reed, Beverly Hills, Cal., for Vasken Anouchian.

James C. Chalfant, Los Angeles, Cal., for Richard Ferris.

Mark Nurik, Miami, Fla., and Brendan O'Neill, Santa Monica, Cal., for Carlos Desoretz.

Robert Perry, Los Angeles, Cal., for Ronel Refining, Inc.

Anna Ho, Torrance, Cal., for Krikor Chahinian.

Paul Potter, Pasadena, Cal., for Zepur Moroyan.

Elliot Stanford, Los Angeles, Cal., Theodore Flier, Encino, Cal., for Joyce Momdjian.

Edward Masry, Studio City, Cal., for Juan Carlos Seresi.

Doris J.K. Cabrera, Studio City, Cal., for Ruben Saini.

Gene Moscovitch, Los Angeles, Cal., for Vagram Mario Tankazyan.

## MEMORANDUM AND DECISION

KELLER, District Judge.

Before the Court is defendants' motion to suppress the products of video surveillance conducted from November 21, 1988 through February 2, 1989 during an investigation which led to the present indictment, as well as that in *United States of America v. Koyomejian, et al.* In *Koyomejian,* the Honorable Consuelo Marshall was presented with and granted a motion to suppress evidence from video surveillance conducted in a manner similar to that in this case. That ruling prompted the present motion.

For the reasons which follow, the defendants' motion [1] to suppress evidence from video surveillance is hereby DENIED.

1. The motion to suppress video surveillance was presented by counsel for Vahe Andonian and joined by other defendants.

2. Defendants in their memorandum have indicated the apparent bases for Judge Marshall's ruling. Based on that assessment, defendants urge the Court to find as follows:

## DISCUSSION

Defendants have moved to suppress evidence from videotape surveillance conducted at the business of Nazareth and Vahe Andonian between November 21, 1988 through February 22, 1989. The surveillance was conducted pursuant to an order issued by the Honorable Ronald S.W. Lew. That order permitted the law enforcement officers to enter surreptitiously and install a system of closed-circuit television (CCTV) to survey the activities on the premises. These cameras recorded all activities in suite 300 at 220 W. 5th Street, Los Angeles, through December 21, 1988, before being repositioned to suite 313. The cameras remained in suite 313 through the completion of the investigation, February 22, 1989, where they recorded hundreds of hours of alleged "money-counting" as well as the visits of each of the defendants, except Mr. Vivas.

Defendants' motion to suppress is based on two grounds; first, that video surveillance is prohibited by Title III (18 U.S.C. §§ 2510–2520) and the Foreign Intelligence Surveillance Act (50 U.S.C. §§ 1801–1811), and second, that video surveillance as conducted in this case is an unreasonable search and seizure, violative of the Fourth Amendment to the United States Constitution. As defendants indicate, three Circuits have ruled that video surveillance is permissible notwithstanding its absence from Title III. *See United States v. Torres,* 751 F.2d 875 (7th Cir.1984) *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985); *United States v. Biasucci,* 786 F.2d 504 (2d Cir.) *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *United States v. Cuevas–Sanchez,* 821 F.2d 248 (5th Cir.1987). The Ninth Circuit has yet to address the issue. This Court now takes up the question.[2]

1. As a matter of law, Title III does not authorize domestic electronic surveillance;
2. Under the facts of this case, television surveillance from November 21, 1988 to February 22, 1989, was an unreasonable search and seizure; and
3. All evidence obtained as a result of television surveillance, as well as all evidence

In order to determine the legality of video surveillance, the Court must determine (1) whether CCTV is governed by Title III; (2) what can be inferred about CCTV from its absence from Title III; (3) what can be inferred from its inclusion in the Foreign Intelligence Surveillance Act (FISA); (4) the effect of the exclusivity clause in Title III and FISA; (5) whether the Court has independent power to effect a warrant for CCTV surveillance; and (6) whether the issuance of such a warrant in the present case comports with the Fourth Amendment. These questions are taken up in turn.

Title III

■ Electronic surveillance is largely governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, known as the federal wiretap law. Indeed, in a previous round of suppression motions directed to different aspects of the electronic surveillance in this case, the Court dealt at length with Title III's requirements of necessity, particularity, and minimization, among other requirements of the law. None of the previous motions, however, raised the issue of video surveillance. This is not surprising given the fact that Title III, replete with regulations and definitions for electronic and aural interceptions, is completely silent as to the use of video.

This silence is in part due to the purpose of the Act and its age. The Act was passed in the wake of two rulings by the United States Supreme Court which outlined Fourth Amendment restrictions on the use of electronic devices to intercept communications. In *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), a New York electronic surveillance statute was deemed unconstitutional for its expansive grant of authority, like the maligned "general warrant" in England. The *Berger* Court set forth requirements for specificity and particularity which have been incorporated into Title III. The statute is also intended to conform with the

procedural limits discussed in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), where the Court set forth the reasonable privacy expectations which require warrants before invasion. Thus, Title III had as its purpose both the protection of the privacy of wire and oral communications as well as the establishment of procedures to facilitate the use of intercepts to advance the fight against organized crime. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 66–72 (1968), 1968 U.S.Code & Admin.News 2110, 2153–2159.

Title III does not address video surveillance because the statute only governs "the interception of wire or oral communications." 18 U.S.C. §§ 2516(1), 2518(1). This follows from the concerns raised in both *Berger* and *Katz* which were unique to the problem of intercepts and eavesdropping. In *Berger*, the Supreme Court focused solely on communications between parties as an intangible privacy right protected by the Fourth Amendment. Similarly, in *Katz* the Court was concerned with communications and their interception, not optical surveillance. To be sure, the distinction is somewhat formal, and the rationale of *Katz* must be construed to reach official observation of conduct undertaken with a reasonable expectation of privacy. But whether video surveillance in a home or office is subject to Fourth Amendment protection is not at issue. The question is whether the exclusion of video surveillance from Title III should be read as implying its ban. The focus of the Act persuades this Court that such a reading would be unwarranted. *Katz* and *Berger* concern communications; they simply indicate the direction from which Congress was coming when it enacted Title III.

Indeed, communications have been the keynote of the wiretap Act from its inception through its most recent amendment. Congress first regulated the use of intercepted communications in section 605 of the Communications Act of 1934. 47

*which are the fruits thereof, [be] ordered suppressed.*
Defendants' Motion to Suppress at 7. Because Judge Marshall ruled orally and no transcript

has been made available, this Court does not have the benefit of her reasoning.

U.S.C. § 605. Title III was then revised substantially by the Communications Privacy Act of 1986. Pub.L. 99–508. This Act amended the "1968 [wiretap] law to update and clarify Federal privacy protections and standings in light of dramatic changes in new computer and telecommunications technologies." S.Rep. No. 99–541, 99th Cong., 2d Sess. at 1, 1986 U.S.Code Cong & Admin.News at 3555. The 1986 Act amended Title III to sharpen the focus on communications, both oral and electronic, and expand the scope to include data transmissions and even the transmission of electronic images. These are all communications which pass from their origin to the intended recipient and are subject to third-party intervention. Congress' view of interception can be described as a perpendicular concept, where the interception of a communication crosses its path like the trunk of a "T". Video surveillance of a person's activity, unlike the interception of video images in transit, simply does not fit this conception. The legislative history to the 1986 amendments recognizes this distinction.

> Although this bill does not address questions of the application of title III standards to video surveillance and only deals with the interception of closed circuit television communications to a limited extent, closed circuit television communications do provide another example of the importance of, and the interrelationship between, the definitions contained in this legislation. If a person or entity transmits a closed circuit television picture of a meeting using wires, microwaves, or another method of transmission, the transmission itself would be an electronic communication. Interception of the picture at any point without either consent or a court order would be a violation of the statute. **By contrast, if law enforcement officials were to install their own cameras and create their own television picture of a meeting, the captur-**
> **ing of the video images would not be an interception under the statute because there would be no interception of the contents of an electronic communication.** Intercepting the audio portion of the meeting would be an interception of an oral communication, and the statute would apply to that portion.

S.Rep. 99–541, 99th Cong., 2d Sess., at 16, 1986 U.S.Code & Admin.News at 3570–71 (emphasis added). The highlighted portion is directly on point and indicates that video surveillance is not governed by Title III. More importantly, it reveals that by omission Congress did not intend to preclude law enforcement use of video surveillance. "It does not follow … that because Title III does not authorize warrants for television surveillance, it forbids them." *United States v. Torres*, 751 F.2d at 880 [3]; *Cf. Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) ("In the face of [the legislative history of Title III], one simply cannot assume that Congress, aware that most bugging requires entry, nonetheless wished to except surveillance requiring such entries from the broad authorization of Title III, and that it resolved to do so by remaining silent on the subject").

Title III does not place restrictions on the use of video surveillance by excepting it from its scope nor is the silence susceptible to an inference that Congress intended to forbid its use. If law enforcement is to be denied the benefit of video surveillance, it must be by means other than Title III.

## Foreign Intelligence Surveillance Act

The Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811, for the first time placed legislative restrictions on the Executive's use of surveillance to gather information relating to "national security." This purpose is evidenced by the major theme of the Act, which was the repeal of section 2511(3) in title 18—the wiretap act as enacted in 1968—and the significant abridgement of an Executive

---

**3.** When he reached this conclusion Judge Posner did not have the benefit of the 1986 amendments or the legislative history which accompanied them. Nonetheless, his conclusion followed from the nature of the wiretap act and is supported by the more recent developments in the law, notwithstanding the criticism it sustained by concurring Judge Cudahy in the *Torres* opinion and defendants in their brief.

prerogative theretofore assumed to exist. Section 2511(3) in 1968 said, in part:

> Nothing contained in this chapter or in section 605 of the Communications Act of 1934 ... shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure of the existence of the Government. * * *

18 U.S.C. § 2511(3) (1968). That clause had sustained the Executive's exemption from the warrant requirement where matters of national security were involved and had become the subject of continued debate. *See id.* at 9–15, 1978 U.S.Code Cong. & Admin.News at 3904, 3910–16 (detailing the expanding use of the Executive exemption since F.D. Roosevelt's Presidency). By repealing it, Congress sought to bring the President's use of surveillance for purposes of national security under the control of the legislature, ending a long reign of overuse and indiscriminate surveillance which had become the subject of Congressional derision. *See* Church Committee Report, quoted in S.Rep. 95–604 at 8, 1978 U.S.Code Cong. & Admin.News at 3909. Into this fold of legislative supervision Congress brought video surveillance for the first time by including it in the definition of "electronic surveillance." S.Rep. 95–604 at 34–36, 1978 U.S.Code Cong. & Admin.News at 3936–37. The definitions were "meant to be broadly inclusive, because the effect of including a particular means of surveillance [was] not to prohibit it but to subject it to judicial oversight." *Id.* Thus, the legislative history noted that the definition "could also include miniaturized television cameras and other sophisticated devices not aimed merely at communications," *id.*, including them not to ban them but to regulate their use.

Notwithstanding this broad Congressional stroke, the video surveillance in this case is not covered by the Foreign Intelligence Surveillance Act. Neither defendants nor the Government contend that it is. The Act governs surveillance accumulated under the guise of national security; the video tapes in question here were accumulated during an investigation seeking to enforce the nation's criminal laws.

Defendants contend that by incorporating video surveillance into FISA, Congress intended to forbid its use elsewhere; *Inclusio unius est exclusio alterius* (the inclusion of one is the exclusion of another). To hold otherwise, to permit video surveillance with the less rigorous warrant requirements of the Fourth Amendment, defendants suggest, would make a mockery of the comprehensive regulations placed on their use in FISA. The argument garners its force from the fact that in enacting FISA, Congress amended Title III to repeal section 2511(3) (the disclaimer clause) and replace it with section 2511(2)(f), to provide that "procedures in [Title III] and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire and oral communications may be conducted." 18 U.S.C. § 2511(2)(f), as amended. Defendants therefore contend that absent compliance with the procedural mechanisms in FISA, video surveillance is a means forbidden to the federal government.

Permitting use of video surveillance outside of the foreign affairs arena with the issuance of a warrant by a federal judge does not undermine the purpose of FISA's stringent regulations. The Foreign Intelligence Surveillance Act provides a method for Executive intelligence gathering over a wide-range of activities. Many of these areas—and of great concern to the Congress which enacted the legislation—are noncriminal. *See* S.Rep. 95–604, 95th

Cong., 2d Sess., at 17–18, 1978 U.S.Code Cong. & Admin.News at 3919–20. In compensating for the breadth of activities subject to surveillance, Congress imposed a rigid procedural safeguard as a precondition to its employment. *See id.* at 18, 1978 U.S.Code Cong. & Admin.News at 3919 ("[t]his bill authorizes electronic surveillance in a limited number of noncriminal situations only under the twin safeguards of an independent review by a neutral judge and his application of a 'probable cause standard' "). FISA also sets procedures for the selection of a special panel appointed by the Chief Justice to review Executive surveillance applications. 50 U.S.C. § 1803. Indeed, the approval mechanism is a good deal more rigorous than that in Title III. *See* 50 U.S.C. § 1804 (requiring authority of United States Attorney General and certification by Presidential assistant for National Security Affairs). But these procedures are aimed at a perceived specific evil, the abuse of invasive surveillance techniques on a broad scale against citizens suspected of no more than anti-Americanism under the guise of the Executive's charge to oversee foreign affairs. By its ruling in *Youngstown Sheet and Tube v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the Supreme Court gave Congress license to limit Executive hegemony in this area by affirmative legislation. In amending Title III Congress did just that. The President's ability to unfurl the banner of foreign affairs and use it to cloak sweeping investigative activities was brought to an end.

This observation also explains the insertion of the exclusivity clause upon which defendants' argument depends. The legislative history is helpful.

> Paragraph (f) continues by stating that with respect to electronic surveillance, as defined in Section 2521(b)(6) [to include video surveillance], and the interception of domestic wire and oral communications, the procedures of chapter 119 and chapter 120 shall be the "exclusive means by which electronic surveillance ... may be ... conducted." This statement puts to rest the notion that Congress recognizes any inherent Presidential power to conduct such surveillances in the United States outside of the procedures contained in chapters 119 and 120.

S.Rep. 95–604, 95th Cong., 2d Sess., at 64, 1978 U.S.Code Cong. & Admin.News at 3965–66. This excerpt reveals that Congress intended to sew up the perceived loopholes through which the President had been able to avoid the warrant requirement. The exclusivity clause makes it impossible for the President to "opt-out" of the legislative scheme by retreating to his "inherent" Executive sovereignty over foreign affairs. At the time of the drafting of FISA, such a retreat would have meant completely unfettered use of electronic surveillance in the foreign affairs arena, as the Supreme Court had twice declined to hold such Executive action captive to the warrant requirement. *See United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (referred to as *Keith*, after District Judge Damon Keith) (declining to apply warrant requirement to Executive surveillance for foreign affairs); *Katz v. United States*, 389 U.S. at 358, n. 23, 88 S.Ct. at 515, n. 23 (1967) (refusing to extend warrant requirement to cases "involving the national security"); S.Rep. 95–604, 95th Cong., 2d Sess. at 12–14, 1978 U.S.Code Cong. & Admin. News at 3913–16. Congress' concern over this significant gap in Fourth Amendment jurisprudence is clearly what motivated the legislation. The legislative history, after reviewing the Supreme Court's and various circuit courts' treatment of the Executive foreign affairs exemption, stated the following:

> Thus, after almost 50 years of case law dealing with the subject of *warrantless* electronic surveillance, and despite the practice of *warrantless* foreign intelligence surveillance sanctioned and engaged in by nine administrations, constitutional limits on the President's powers to order such surveillances remains an open question. This legislation would provide the secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign

intelligence purposes within the context of the Nation's commitment to privacy and individual rights.

S.Rep. 95–604, 95th Cong., 2d Sess. at 15, 1978 U.S.Code Cong. & Admin.News at 3916 (emphasis added).

The exclusivity clause in 18 U.S.C. section 2511(2)(f) assures that the President cannot avoid Congress' limitations by resort to "inherent" powers as had President Truman at the time of the "Steel Seizure Case." *Youngstown Sheet and Tube v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); S.Rep. 95–604, 95th Cong., 2d Sess. at 64, 1978 U.S.Code Cong. & Admin.News at 3966 (noting that *Youngstown* permits Congress to proscribe Executive authority in foreign affairs by legislation "where, absent such legislation, a constitutional power of the executive may be found to exist"). A review of the arguments proffered by the President in *Youngstown* explains Congress' explicit statement in section 2511(2)(f).

In *Youngstown*, the Court was faced with the question whether President Truman had acted within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills. The Government had argued that the order was made on findings of the President that his action was necessary to avert a national catastrophe that would result from massive strikes, and that such power was "inherent" in the President's position as the Nation's Chief executive and Commander in Chief of the Armed Forces. Justice Black, for the Court, stated that the "President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585, 72 S.Ct. at 865. There were at the time two statutes enacted by Congress which did authorize the President to take both real and personal property, but only under certain conditions which, as the Government then admitted, were not applicable. Instead, President Truman bypassed legislative restrictions and used inherent Executive authority. "[T]he Government admits that the President's order was not rooted in either of the statutes.

The Government refers to the seizure provisions of one of these statutes [ ] as 'much too cumbersome, involved, and time-consuming for the crisis which was at hand.' " *Id.* at 586, 72 S.Ct. at 866 (citation omitted).

The difficulty in the case was due to Congressional silence. Earlier, in 1947, considering legislation to deal with industrial conflicts, Congress had considered a proposal to give the Executive broad seizure power and had rejected it. The President argued that absent specific legislation denying him the alternative avenue—his inherent power—he was free to exercise it to go around the law which imposed procedures for Congressional consent. There was, after all, no law suggesting that those procedures were the exclusive means to the end. Justice Frankfurter, concurring, recognized that such an explicit limitation would have foreclosed any inherent power argument. "It cannot be contended that the President would have had power to issue this order had Congress explicitly negated such authority in formal legislation." *Id.* at 602, 72 S.Ct. at 893.

> It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of seizure, to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld.

*Id.* at 609, 72 S.Ct. at 896. Thus, *Youngstown* had to be resolved on inferences from Congress' rejection of earlier legislation. That rejection was read as denying the President's inherent power. *Id.*

In his acclaimed concurrence, Justice Jackson framed the significance of Congressional silence.

> When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress

may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives and events and contemporary imponderables rather than on abstract theories of law.

*Id.* at 637, 72 S.Ct. at 871 (Jackson, J., concurring);. *see also* S.Rep. 95–604, 95th Cong. 2d Sess., at 64–65, 1978 U.S.Code Cong. & Admin.News at 3966 (quoting remainder of Justice Jackson's opinion on the effect of affirmative legislation on the President's power). Justice Jackson's statement describes the distribution of powers at FISA's enactment, where the inherent power of the Executive to conduct warrantless searches was in doubt but fortified by congressional inertia. In enacting FISA, Congress sought merely to establish its control over an area previously relegated to the "zone of twilight," and resolve a question that had invited inconclusive litigation over who possessed the power and what it meant. *See Zweibon v. Mitchell*, 516 F.2d 594 (D.C.Cir.1975) (en banc) *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976) (questioning the "foreign affairs" exception); *United States v. Butenko*, 494 F.2d 593 (3d Cir.1974) (en banc) *cert. denied sub nom. Ivanov v. United States*, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974) (electronic surveillance conducted without a warrant permissible so long as primary purpose to obtain foreign intelligence); *United States v. Brown*, 484 F.2d 418 (5th Cir.1973) *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974) (inadvertent surveillance of American citizen admissible in warrant-

less wiretap intended for foreign intelligence purposes). To foreclose the arguments which piqued the Court in *Youngstown*, Congress denied the President his inherent powers outright. Tethering Executive reign, Congress deemed that the provisions for gathering intelligence in FISA and Title III were "exclusive." [4]

The exclusivity provision was aimed at limiting extra-Constitutional Executive prerogative during a time of waxing Congressional control and waning Presidential autonomy. The exclusivity provision in section 2511 had a definite purpose. It did not intend to curtail law enforcement investigations of criminal activities. That sphere was not at issue. By withdrawing from the Executive the longstanding foreign affairs exemption to the warrant requirement, Congress accomplished its goal. *See* S.Rep. 95–604, 95th Cong., 2d Sess., at 7, 1978 U.S.Code Cong. & Admin.News at 3908 ("this legislation ends the eight-year debate over the meaning and scope of the inherent power disclaimer clause [in former Title III]"). Because of Congress' explicit statement, the President can no longer opt-out of the warrant requirement. The Executive must, like law enforcement in the States, make an application to a judicial officer for an independent review of probable cause, necessity, minimization procedures, and duration. To extend the reach of FISA to eliminate a significant tool of law enforcement would not do justice to the legislation or effect its end. The Court, wherever possible, should eschew hypertechnical constructions of the law which subvert its goals.

> The judicial duty of statutory interpretation is not a duty merely to read; it is a duty to help the legislature achieve the aims that can reasonably be inferred from the statutory design, and it re-

---

**4.** That *Youngstown* was on Congress' mind when it enacted the exclusivity clause is not mere speculation.

> The basis for this legislation is the understanding—concurred in by the Attorney General—that even if the President has an "inherent" constitutional power to authorize warrantless surveillance for foreign intelligence purposes, Congress has the power to regulate the exercise of this authority by legislating a

> reasonable warrant procedure governing foreign intelligence surveillance.

S.Rep. 95–604, 95th Cong., 2d Sess. at 16, 1978 U.S.Code Cong. & Admin.News at 3917 (citing *Youngstown* as authority for this usurpation). Congress was not concerned with the use of video surveillance by law enforcement, but by the use of any means of invasive surveillance by the President without a warrant.

quires us to pay attention to the spirit as well as the letter of the statute.

*United States v. Torres,* 751 F.2d at 887 (Cudahy, J., concurring) (quoting *United States v. Markgraf,* 736 F.2d 1179, 1188 (7th Cir.1984) (Posner, J., dissenting from denial of rehearing *en banc* )).

■ Defendants have objected to Judge Posner's conclusion in *Torres* which reads too little into the exclusivity clause. The objection is well-founded. Regarding the clause, Judge Posner states: "[a]ll this section means to us, however, is that the Foreign Intelligence Surveillance Act is intended to be exclusive in its domain and Title III in its." The analysis is somewhat curt and leads to a conclusion—that the exclusivity clause means virtually nothing— which this Court is compelled to reject. But the effect is the same. The fact that video surveillance is omitted from Title III and included in FISA—which does not apply in this case—does not oblige the conclusion that it is unavailable. It is subject, like any judicial act authorizing a search or seizure, to the limitations of the Fourth Amendment and the requirements formulated in the cases construing it. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It is to those requirements which the Court now turns.

Judicial Authority and the Fourth Amendment

■ Judge Posner's *Torres* opinion thoroughly sets forth the history and bases for judicial authority to issue warrants in furtherance of law enforcement activity absent Congressional sanction. *Id.,* 751 F.2d at 877–880. Even Judge Cudahy, who filed a deliberate concurrence, did not take issue with it. Posner found authority for the issuance of an order to install and monitor CCTV in Fed.R.Crim.P. 41(d) and *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). Posner rightly considered *New York Telephone* as weighty support for a Court's power to issue orders for video surveillance, as well other opinions from the Supreme Court that have vested final authority for warrant issuance and over-

sight in the judiciary. *See Torres,* 751 F.2d at 878–80. To contend that video surveillance alone among the tools of law enforcement is beyond the competence of the Courts is no less anomalous than it is Procrustean.

The power of the Courts to issue warrants for searches and seizures (upon probable cause) for subjects not governed by statute is well-established. Before Title III set forth a scheme for the administration of electronic surveillance, Courts regularly issued orders permitting their use. *Biasucci,* 786 F.2d at 509 (detailing history); *Katz,* 389 U.S. at 354–56, 88 S.Ct. at 512–14 (warrant for wiretap); *Osborn v. United States,* 385 U.S. 323, 328–30, 87 S.Ct. 429, 432–33, 17 L.Ed.2d 394 (1966) (electronic transmitter on law enforcement officer); *see also* Taylor, *Two Studies in Constitutional Interpretation* 112, 114 (1969) ("[*Katz* ] does not say that a clandestine trespass to install a bug may be authorized by an ex parte surveillance order, but such is plainly the consequence of its reasoning"). It is the issuing court's duty to examine the application of law enforcement officials, see that it comports with Constitutional standards, and rule on its propriety. It is the reviewing court's duty to see that the ruling was in accord with the law.

This implicates Fourth Amendment analysis, and the Supreme Court's decisions in *Katz,* 389 U.S. 347, 88 S.Ct. 507 and *Berger,* 388 U.S. 41, 87 S.Ct. 1873, govern. In order to give effect to this review, the video surveillance should be checked for compliance with the procedures set forth in Title III. In *Torres,* Judge Posner incorporated the restrictions on minimization, particularity, duration and necessity from Title III into his constitutional analysis, but left Title III's other restrictions aside. Defendants in their brief accuse Judge Posner of legislating, as does Judge Cudahy in his concurrence. But this accusation is unjust. Judge Posner was applying the constitutional test to electronic surveillance set forth in *Berger. Berger* was in part the impetus for Title III's restrictions. Thus, it is sensible when reviewing surveillance governed by *Berger* but not Title III, that Title III's restrictions

be used as a guide. Other courts reviewing video surveillance have wisely done the same. *See Cuevas–Sanchez,* 821 F.2d at 252; *Biasucci,* 786 F.2d at 510. To disregard Title III (and therefore the strictures of *Berger*) would rob the life from the law; to formulate new procedures from whole cloth would be a judicial extravagance. Title III's procedures serve as a useful guide in a Fourth Amendment review of the surveillance and should be applied here.

The analysis of Title III need not, however, be repeated, and this Court refers the parties to its lengthy review of the wiretap applications conducted at the hearings on December 12–14, 1989. Indeed, defendants do not appear to contest the Government's showing of probable cause or its compliance with procedural requirements. Instead, defendants argue that video surveillance in a case like this is *per se* unconstitutional, that the invasive nature of electronic observation simply cannot be justified absent compelling and dangerous circumstances. Defendants note that *Torres* involved the surveillance of a suspected terrorist organization in the process of making bombs. Though an exception might be formulated permitting video surveillance of such dangerous conduct as bomb making, no showing of probable cause could possibly permit such indiscriminate and invasive surveillance in this case, with or without a warrant.

■ This Court cannot agree. The use of video, as indicated by Judge Posner in *Torres,* is no more indiscriminate than an aural intercept. *Id.,* 751 F.2d at 885. While it is more invasive, and reaches further beyond the perimeter of a person's reasonable expectations of privacy than do other electronic monitoring devices, it can hardly be said to "shock the conscience," compelling a ban on its use. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (fifth amendment context). Indeed, searches are routinely conducted of people's homes, cars, effects—sometimes their very persons are subject to strip

search—under less rigorous constitutional requirements. (*See Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Smith,* 470 F.2d 377 (D.C.Cir.1972); *United States ex rel. Guy v. McCauley,* 385 F.Supp. 193 (E.D.Wis.1974) (extreme examples of invasive searches sanctioned by the Fourth Amendment without a warrant)). Video surveillance, unlike those methods, cannot under any circumstances be maintained without a warrant. Its continuing nature, while contributing to its invasiveness, subjects it to further oversight as well. *See* Note, 67 Geo.L.J. 1429, 1446 (1979) ("An argument can be made that the method of carrying out a normal search warrant should not be subjected to prior scrutiny because it is impossible to forecast exactly what kinds of fourth amendment interests might be compromised. But this is not at all the case with bugging orders. Police must almost always secretly break and enter private premises if the bug is to succeed. That bugs require covert entry does not excuse the requirement for prior judicial scrutiny, but instead militates for requiring the interposition of a magistrate"). The one-time strip search, humiliating and utterly invasive, cannot be stopped by an intervening judicial officer. But all of these methods are recognized as necessary to the effective control of crime and are, after meeting certain requirements, constitutionally sanctioned. The Government's applications in support of CCTV surveillance, granted by a United States District Judge, are specific and meet the requirements of *Katz* and *Berger.* Unpersuaded that video surveillance is so singularly invasive to be *per se* unconstitutional, the Court must reject defendants' contention that it ought to be suppressed.[5]

### Alternative Grounds

The above analysis persuades the Court that the search by means of video surveillance was lawful, but it should be noted that the "use of fruits of [even] a past unlawful search or seizure 'works no new

---

**5.** Defendants and the Government have differing views on standing. Because the Court today

holds that the video surveillance in question was legal, the issue of standing is moot.

 

Fourth Amendment wrong.'" *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1983) (citation omitted). The legality of a search and the question of suppression are independent issues and, in many cases, the suppression of evidence does not serve to mend an invasion of privacy which is a completed act. To be sure, it provides a welcome consolation; but it is in the end merely a judicial invention unconnected to the alleged wrong and costly to the interests of an orderly society. *See id.* at 907–08, 104 S.Ct. at 3412 ("[o]ur cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury"). This is especially so where the officers acted upon the order of a federal district judge and whose conduct in effecting that order in no way has been sullied by accusations of bad faith.

■ As the Court's previous examination makes clear, there is no foundation for a claim that the order permitting video surveillance was patently unconstitutional. This Court is not so imbued with its own good judgment to deny the possibility that its Title III analysis might, after review, be called into question; but no reasonable mind could find the Court's conclusion to be an implausible one from the face of Judge Lew's order or a review of current law. That is the standard to which the officers who effect a warrant are held. The suppression of evidence in a case so close to the margin could not pretend to deter police misconduct or to enhance the reviewing function of a magistrate. *See id.* at 916, 104 S.Ct. at 3417. Where the police acted properly within the confines of the warrant—and there is no suggestion otherwise—the evidence obtained as a result of their surveillance should not be suppressed. Consequently, the motion to suppress evidence is denied on the strength of *United States v. Leon* and the facts of this case. *Id.* at 918, 104 S.Ct. at 3418 ("suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those un-

usual cases in which exclusion will further the purposes of the exclusionary rule").

CONCLUSION

For the reasons stated in the foregoing memorandum, defendants' motion to suppress the fruits of video surveillance is hereby DENIED.

IT IS SO ORDERED.