**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Wanis KOYOMEJIAN, Raffi Kouyoumjian, Simon Kouyoumjian, Agop Kouyoumjian, Ohanes Khawaloujian, Salim Chalhoub, Rita Sorfazian, Dalida Avakian, Avedis Khawaloujian, Jimmy Contreras, Raul Vivas, Hamayak Atayan, Defendants–Appellees.**

No. 90–50218.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 1990.

Decided Oct. 15, 1991.

Rehearing Granted and Opinion
Amended Jan. 16, 1992.

Mark J. Werksman, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellant.

Howard L. Weitzman, Steve Cochran, David R. Fields, Katten Muchin Zavis & Weitzman, Los Angeles, Cal., for defendants-appellees Wanis Koyomejian and Simon Kouyoumjian.

**1452**

Before NORRIS, REINHARDT and HALL, Circuit Judges.*

REINHARDT, Circuit Judge:

This case presents the question whether federal law enforcement officers may legally subject individuals to video surveillance as part of a domestic criminal investigation, and if so what standards govern such surveillance. We join the four other circuits that have faced this question and found that, properly conducted, video surveillance in domestic criminal investigations is lawful, although we base our conclusion on somewhat different grounds.[1] We hold further that the procedural requirements of the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510–2520 (1988) ["Title I"], apply to such surveillance.[2]

## FACTS

In January, 1988, federal law enforcement agents began investigating Wanis Koyomejian and eleven other defendants in connection with their alleged participation in a drug-related money-laundering operation. On September 9, 1988, the government filed an application in the United States District Court for the Central District of California for an order authorizing the installation of hidden closed circuit television cameras in the defendants' Los Angeles business premises.[3] On the same day, the district court issued an order authorizing such surveillance for a period of up to 30 days to begin no later than ten days after the date of the order, September 19.[4] Thereafter, the government applied for and the district court issued four 30–day extensions of the authorization for the video surveillance. On February 22, 1989, the defendants were arrested and the surveillance ceased.

The defendants were subsequently charged in a 17–count indictment, filed March 7, 1989. On November 20, 1989, the defendants moved to suppress all evidence gathered through the video surveillance. The district court granted this motion on March 27, 1990.[5] The district judge held that, when read together, Title I and the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811 (1978) ["FISA"], prohibit video surveillance in domestic law enforcement.[6] The government moved for reconsideration, and the district court denied the motion. The government then filed a timely notice of appeal, under 18 U.S.C. § 3731 and Fed.R.App.P. 4(b).

---

* This case was originally heard by Judge Reinhardt, Judge Hall, and the Honorable Edward Re, Chief Judge, United States Court of International Trade. Judge Norris was substituted for Judge Re upon the latter's resignation from the bench.

1. *See United States v. Mesa–Rincon*, 911 F.2d 1433, 1437 (10th Cir.1990); *United States v. Cuevas–Sanchez*, 821 F.2d 248, 251–52 (5th Cir. 1987); *United States v. Biasucci*, 786 F.2d 504, 508–510 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *United States v. Torres*, 751 F.2d 875, 833 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). We previously reserved this question in *United States v. Taketa*, 923 F.2d 665, 675 (9th Cir.1991); we now resolve it.

2. The other circuits that have addressed this question have referred to Title I's precursor, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1968).

3. During the same investigation, the government also sought and obtained authorization to conduct video surveillance of two New York locations. The evidence obtained from that surveillance was not at issue in the court below and is not before us on appeal.

4. In its order, the court found: (1) that the video surveillance would lead to admissible evidence of the underlying criminal charges; and (2) that normal investigative techniques had been tried and had failed, or reasonably appeared unlikely to succeed if tried, or were too dangerous to employ.

5. On the same day that the district court granted the defendants' motion to suppress, a superseding indictment was filed charging them with 14 counts. The superseding indictment contains charges similar to those alleged in the original indictment. Neither party has suggested and we find no indication that the filing of the superseding indictment has any effect upon the district court's ruling or the posture of the issue on appeal.

6. The video surveillance conducted in this case was ruled illegal by Judge Marshall. She was not the judge who had granted the initial application for the surveillance or the subsequent extensions.

The district court stayed the trial pending our resolution of this interlocutory appeal.

## DISCUSSION

Title I sets forth procedures that federal agents must follow when using a variety of surveillance techniques in connection with domestic criminal investigations. The portion of Title I that is at issue here provides, in pertinent part, that the "procedures in this chapter and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire and oral communications may be conducted." 18 U.S.C. § 2511(2)(f) (1990). Although FISA expressly covers video surveillance, Title I contains no mention of that technique. The parties dispute the significance of this fact.

The defendants contend that section 2511(2)(f) means that electronic surveillance may only be conducted if expressly authorized by FISA or Title I. They then argue that FISA only authorizes video surveillance for foreign intelligence purposes, while Title I, which applies to domestic law enforcement, contains no similar authorization. They then conclude that video surveillance in domestic criminal investigations is prohibited. The district court adopted the defendants' view.

On the other hand, the government emphasizes the fact that FISA only applies to the foreign intelligence sphere. It argues that since electronic video surveillance is mentioned only in FISA, there are no statutory limits on its use for domestic law enforcement purposes. The government vigorously rejects the district court's conclusion that the omission of video surveillance from Title I's list of techniques means that video surveillance is barred by the provisions of that Title.[7] The government argues in the alternative that if the procedural requirements of Title I do apply, those requirements were met.

In short, the defendants claim that because video surveillance is not mentioned in Title I it is unauthorized, while the government argues that because it is not mentioned it is unregulated. Our answer lies between the extreme positions asserted by the litigants. We conclude that video surveillance is *not* contrary to law but that it *is* regulated by statute.

 We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will. *Arizona Appetito's Stores, Inc. v. Paradise Village Investment Co. (In re Arizona Appetito's Stores)*, 893 F.2d 216, 219 (9th Cir.1990). Where the intent of Congress is evidenced clearly in the language of the statute, our inquiry ends there. *Haynes v. United States*, 891 F.2d 235, 238 (9th Cir. 1989). If, however, the statutory language gives rise to more than one reasonable interpretation, our duty is "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *Commissioner v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) (quoting *NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part)), *quoted in United States v. 594,464 Pounds of Salmon*, 871 F.2d 824, 827 (9th Cir. 1989). In particular, "[w]hen Congress has not directly addressed and answered a question, courts ... in answering, by necessity, should be guided by the aims, principles and policies that manifestly underlie enacted statutes." *In re Order Authorizing Interception of Oral Communications and Videotape Surveillance*, 513 F.Supp. 421, 423 (D.Mass.1980) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 463–64, 95 L.Ed. 456 (1951) (Frankfurter, J.)). While it is not the easiest of tasks to do so, we now apply these general principles.

### I

 Section 2511(2)(f) makes the procedures set forth in Title I and FISA "the exclusive means by which electronic surveillance, as defined in FISA, and the interception of domestic wire and oral communications may be conducted." 18 U.S.C. § 2511(2)(f). "[E]lectronic surveillance," as defined by FISA, includes:

> the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under cir-

---

**7.** The government argues that the only barriers to video surveillance in domestic criminal investigation are those found in the fourth amend-

ment. The defendants do not argue on appeal that video surveillance is prohibited by that amendment.

cumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f)(4). As both the government and the defendants agree, this broad language was intended by Congress to include video surveillance. *See also* S.Rep. No. 604, 95th Cong., 1st Sess. 35, *reprinted in* 1978 U.S.Code Cong. & Admin.News 3904, 3936 (observing that subparagraph 4 of subsection 1801(f) "could . . . include miniaturized television cameras and other sophisticated devices not aimed merely at communications"); S.Rep. No. 701, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S.Code Cong. & Admin.News 3973, 4006 (same). While FISA contains numerous provisions that expressly use the phrase "electronic surveillance," oddly, Title I does not mention electronic surveillance except in section 2511(2)(f) itself.

In our view, there are three possible interpretations of section 2511(2)(f): (1) as the government contends, it could mean that FISA sets forth all of the constraints applicable to the conduct of foreign intelligence surveillance, that Title I sets forth all of the constraints applicable to the conduct of domestic law enforcement surveillance, and never the twain shall meet. Under this interpretation, a form of surveillance not mentioned in Title I is not subject to regulation when used in connection with a domestic criminal investigation; (2) section 2511(2)(f) might also mean, as the defendants argue, that electronic surveillance may only be conducted as authorized by Title I or FISA, and since Title I does not mention domestic video surveillance while FISA expressly authorizes foreign intelligence video surveillance, domestic video surveillance is not permitted; or finally (3) section 2511(2)(f) could be interpreted as requiring that the procedures set forth in Title I and FISA must be followed for all forms of electronic surveillance mentioned in either statute, the only difference being that if the surveillance is for a domestic

law enforcement purpose the *procedures* set forth in Title I are applicable whereas if the surveillance is for foreign intelligence purposes, FISA's *procedures* apply. None of the interpretations is entirely satisfactory. Nor is any compelled by the language of the statute, standing alone.

In order to arrive at the proper answer, we must consider the legislative history and underlying policies of the relevant statutes, as well as the statutory language. Based on our analysis of all of these sources, we conclude that the statute was not intended to ban *any* form of electronic surveillance but rather to regulate all.[8] In short, we find the third interpretation described above to be the most reasonable. Domestic video surveillance is permissible, but it must be conducted in compliance with the procedures set forth in Title I.[9]

## II

To understand the development of the comprehensive regulatory scheme applicable to video surveillance we begin with Title I's precursor, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1968) ["Title III"].

## A

Title III was enacted in 1968 to regulate domestic electronic surveillance. It expressly addressed the most intrusive kinds of electronic surveillance being used at the time—techniques for the interception of wire and oral communications. *See In re Order Authorizing Interception of Oral Communications and Videotape Surveillance*, 513 F.Supp. 421, 423 (D.Mass.1980) ("when Title III of the Omnibus Crime Control and Safe Streets Act of 1968 was under consideration by Congress, 'interception' of 'oral communications' was the most intrusive form of investigation under scrutiny"). However, the legislative history provides ample evidence that Congress intended through Title III to provide strict regulation of *all* highly intrusive forms of surveillance.

---

**8.** Some forms of less intrusive electronic intelligence-gathering techniques, such as pen registers, are exempt from Title I's coverage. *See* 18 U.S.C. § 2510(8) (stating that "contents" of a wire transmission or oral communication include the "substance, purport, or meaning of that communication," but not the identity of the speaker) (codifying *United States v. New York Tel. Co.,* 434 U.S. 159, 165–68, 98 S.Ct. 364, 368–70, 54 L.Ed.2d 376 (1977)). These devices are subject to less strict regulation than that con-

tained in Title I. *See* 18 U.S.C. § 3121 (1988). *See also* S.Rep. No. 541, 99th Cong., 2d Sess. 3, 13, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3557, 3567.

**9.** We are in substantial agreement with the views expressed by Judge Cudahy in *United States v. Torres,* 751 F.2d 875, 889 (7th Cir.1984) (Cudahy, J., concurring), and throughout this opinion we borrow liberally from his analysis.

There is substantial evidence that Congress believed it was enacting a comprehensive regulatory framework for all forms of intrusive surveillance. We first note the undiscriminating use of the phrase "electronic surveillance" throughout the legislative history. *See* S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2153–63. In addition, the committee reports reflect deep dissatisfaction with the contemporary protection of individual privacy interests, *id.* at 2154–56, 2224–26 (individual views of Sens. Long and Hart), 2227–31 (additional views of Sen. Hart), and discuss the inadequacies of the safeguards articulated in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *id.* at 2153–63. *But cf. id.* at 2227–31 (additional views of Sen. Hart characterizing *Katz* as a "major victory for privacy"). Congress's conclusion that the vague standards found in *Berger* and *Katz* offer inadequate protection for individual privacy is manifest in its enactment of statutory requirements that go substantially beyond the minimal constitutional constraints outlined in those two cases.[10] In their endeavor to obtain passage of the bill, Title III's proponents consistently argued that it struck a proper balance between law enforcement and privacy interests. *Torres*, 751 F.2d at 890 (Cudahy, J., concurring) (citing S.Rep. No. 1097, 90th Cong., 2d Sess. 186–87 (individual views of Sen. Bayh), 214–18 (individual views of Sen. Scott), 220 (individual views of Sen. Eastland), 224–26 (minority statement), *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2245–46, 2264–68, 2270,

2274–75). The Senate Judiciary Committee Report reflects this process of balancing individual privacy concerns with the fight against organized crime. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 67–69 (current state of the law), 70–76 (tension between need for privacy protections and control of organized crime), *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2154–56, 2157–63. This pervasive concern with protecting individual privacy rights, together with the broad use of the phrase "electronic surveillance," strongly suggests that Congress intended the regulatory framework it was erecting to be comprehensive—one that would generally control the use of highly intrusive forms of electronic surveillance for domestic law enforcement purposes.

Of equal importance, the statutory language and legislative history both strongly support the conclusion that Congress chose regulation rather than prohibition of electronic surveillance as the means for protecting privacy concerns. The language of the statute is regulatory, not prohibitory, and there is no indication anywhere in the legislative history that Congress intended to ban any form of surveillance. Thus, Title III may not be given the construction suggested by defendants.

B

The provisions and legislative history of FISA lend additional support to our conclusion. In enacting Title III, Congress, while endeavoring to govern domestic electronic surveillance activity, expressly exempted from the Act's coverage surveillance conducted for national security purposes. 18 U.S.C. § 2511(3) (1968), *repealed by* Pub.L. No. 95–511 [FISA] § 201(c) (1978). The

---

**10.** In his concurrence in *Torres,* Judge Cudahy offered the following sampling of such constraints:

(1) bugging and wiretapping are permitted only when investigating specified crimes, 18 U.S.C. § 2516(1) & (2);

(2) authorization for bugging and wiretapping requests must be centralized in each jurisdiction so as to prevent local abuses and to make an identifiable person answerable for abuses, §§ 2516(1) & (2), 2518(1)(a);

(3) there is a statutory exclusionary rule for information obtained in violation of Title III, and that rule is broader than the constitutional exclusionary rule as it existed in 1968, let alone now, §§ 2515, 2518(10)(a);

(4) bugging and wiretapping must, in many instances, be disclosed to the targets after the investigation is concluded, § 2518(7) & (8)(d);

(5) police officers engaging in warrantless wiretapping or bugging are subject to criminal penalties, § 2511(1);

(6) targets of unlawful wiretapping and bugging have a private cause of action for damages, § 2520;

(7) the statutory requirements for minimizing obtrusiveness are much more specific than the Constitution requires, § 2518(1)(b) & (5); and

(8) bugging and wiretapping are permitted only when the government can show that conventional, less intrusive investigation techniques have proven or are very likely to prove unsuccessful, § 2518(1)(c) & (3)(c).

751 F.2d at 891. These provisions remain essentially unchanged in Title I. *See* 18 U.S.C. §§ 2511(1), 2511(4)(a), 2515, 2516(1)–(2), 2518(1)(a)–(c), 2518(3)(c), 2518(5), 2518(7), 2518(8)(d), 2518(10)(a) & (c), 2520 (1988).

enactment of FISA ten years later constituted Congress's response to perceived abuses of that national security exemption that had occurred in the interim. S.Rep. No. 604, 95th Cong., 1st Sess. 7, *reprinted in* 1978 U.S.Code Cong. & Admin.News 3904, 3908. FISA eliminated the exemption, *see id.* at 4040 (executive branch has no inherent authority to undertake electronic surveillance even in national security and counterintelligence cases), and replaced it with a detailed set of procedural requirements which, with some exceptions, are nearly identical to the provisions of Title III. Indeed; in drafting FISA Congress used Title III as its model, particularly for procedures relating to necessity and minimization. *Compare* 50 U.S.C. § 1805(b), (d) (specificity requirements and durational limitations for foreign intelligence court authorization) *with* 18 U.S.C. § 2518(4)-(6) (specificity requirements, durational limitations and reporting requirements for domestic court authorization); *see also* S.Rep. No. 604, 95th Cong., 1st Sess. 37–41 (Judiciary Comm.), *reprinted in* 1978 U.S.Code Cong. & Admin.News 3938–42 (explicitly drawing FISA's minimization procedures and necessity requirements from those in Title III); *id.* at 3944–50 (basing FISA's substantive requirements for both government applications and court findings on those of Title III). As with Title III before it, the congressional debate leading to the enactment of FISA focused on striking a balance between the privacy interests of individuals and the government's needs— here those of national security. *See* S.Rep. No. 604, 95th Cong., 1st Sess. 7–9, *reprinted in* 1978 U.S.Code Cong. & Admin.News 3904, 3908–10; S.Rep. No. 701, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.Code Cong. & Admin.News 3973, 3985.

■ That Congress believed it was completely regulating electronic surveillance in both domestic law enforcement and foreign intelligence-gathering is shown by the fact that when Congress enacted FISA it included two provisions which stated that the government may only engage in electronic surveillance when it does so in accordance with either FISA or Title III. Those provisions are 18 U.S.C. § 2511(2)(f) (codifying § 201(b) of FISA)[11] and 50 U.S.C. § 1809 (codifying § 109 of FISA). Moreover, there is strong evidence of Congress' intent to integrate the two statutes so as to provide a comprehensive regulatory framework for the conduct of electronic surveillance. Congress included a number of "conforming amendments" for that very purpose. *See, e.g.,* S.Rep. No. 701, 95th Cong., 2d Sess. 68, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 4037 (Intelligence Comm.) (noting that these "conforming amendments" served the "important purpose of integrating" the two electronic surveillance statutes).

At the time Congress enacted FISA, Title III was perceived as a comprehensive regulatory scheme governing electronic surveillance in the sphere of domestic law enforcement. *See, e.g., Dalia v. United States,* 441 U.S. 238, 249, 99 S.Ct. 1682, 1689, 60 L.Ed.2d 177 (1979) (referring to Title III as "provid[ing] a comprehensive scheme for the regulation of electronic surveillance"). FISA served to extend that regulation to the sphere of foreign intelligence. As we have noted, in its definition of electronic surveillance, FISA includes the use of video cameras. There is no evidence in the legislative record that Congress expressly included video surveillance in FISA because it believed that there was a greater need for such regulation in the foreign intelligence sphere than in the domestic sphere. It is reasonable to assume, therefore, that Congress included video surveillance in FISA because by the time of its enactment it recognized that form of surveillance as one of the most highly intrusive forms then in existence. Accordingly, it would have made little sense for Congress to fail to include it.

With respect to the defendants' contentions, there is no evidence in the legislative history of FISA that in enacting 18 U.S.C. § 2511(2)(f) Congress intended to *prohibit* the use of video surveillance in domestic law enforcement. This is hardly surprising given that (1) like Title III before it, FISA does not purport to prohibit anything, but merely to regulate electronic surveillance, and (2) the principal focus of FISA is not domestic law enforcement but surveillance for foreign intelligence purposes.

■ In sum, the legislative history of FISA does not support either the government's reading of 18 U.S.C. § 2511(2)(f) or

---

11. When Congress enacted Title I as a replacement for Title III in 1986, it included only technical amendments to 18 U.S.C. § 2511(2)(f). That section now provides that the government may only engage in electronic surveillance when it does so in accordance with either FISA or Title I. *See* 18 U.S.C. § 2511(2)(f) (1988).

the defendants'. Rather, it supports our conclusion that video surveillance is subject to comprehensive regulation both when used in domestic criminal investigations and in foreign intelligence operations.

### C

The conclusion that Congress intended the statutes regulating electronic surveillance to have expansive coverage is also supported by the language and legislative history of Title I, enacted in 1986. Title I bolstered individual privacy by subjecting additional forms of surveillance to regulation. The legislative history of Title I makes clear that statutory regulation of electronic surveillance was intended to cover the most recently developed forms of electronic communication. S.Rep. No. 541, 99th Cong., 2d Sess. 1, *reprinted in* 1986 U.S.Code & Admin.News 3555 (describing Title I as amending Title III in order "to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies").[12]

■ Like the 90th and 95th Congresses before it, one of the 99th Congress's chief objectives was to protect privacy rights against the rapidly expanding opportunities for intrusions into privacy resulting from advancements in the technology of electronic surveillance. As the Senate Report stated, "the law must advance with the technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances." *Id.* at 3559; *see also id.* at 3572 (citing dramatic changes in technology as "rais[ing] serious issues about the protection of the privacy interests of U.S. citizens, which are of great concern to the Senate and to the American people").

Despite Congress's stated intention in enacting Title I to keep privacy protection in step with technology, the Act does not expressly mention video surveillance. However, the omission does not militate in favor of the conclusion that Congress intended to leave video surveillance unregulated

in domestic criminal cases—nor the conclusion that Congress intended to prohibit such surveillance. Rather, it appears that Congress, determined to expand the scope of the Act to the extent necessary, simply assumed that video surveillance was already regulated by Title III as well as by FISA. That such an assumption was correct follows from at least two facts: (1) as we have noted, the Supreme Court had stated that "electronic surveillance" was covered by Title III, *Dalia,* 441 U.S. at 249, 99 S.Ct. at 1689, and FISA's definition of that term made clear that it included video surveillance; and (2) the integrating provisions we have discussed made all forms of surveillance covered by FISA, including video surveillance, subject to the Title III procedures.

■ We reject the government's suggestion that when enacting Title I Congress intended to leave video surveillance unregulated, for two further reasons. First, in replacing Title III with Title I in 1986, Congress was attempting to close any loopholes left by the earlier act.[13] Were we to hold that Title I leaves the use of video surveillance in domestic law enforcement cases totally unregulated, we would have to conclude that Congress deliberately left open the most gaping loophole of all. Neither the government nor any court to have considered the matter has denied the self-evident truth that video surveillance is even more intrusive and indiscriminate than wire or aural surveillance. *See, e.g., Torres,* 751 F.2d at 878 (recognizing that "secretly televising people ... while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations"). *See also* G. Orwell, *Nineteen Eighty–Four* 4 (1949).[14] Title I regulates forms of surveillance that are far less intrusive than video surveillance. We simply cannot believe that Congress intended the anomalous result of subjecting less intrusive forms of surveillance than video to exacting procedural safeguards while leaving video surveillance itself unregulated.

---

**12.** Among the changes adopted by Congress was an expansion of the definition of the term "intercept" to include "the aural *or other* acquisition of the contents of any wire, electronic, or oral communication." Pub.L. No. 99–508, Title I, § 101(a)(3), 100 Stat. 1848, 1851 (1986) (codified at 18 U.S.C. § 2510(4) (1988)) (emphasis added).

**13.** In introducing Title I in its original form, Representative Kastenmeier (D–Wis) stated:

"Technology has outstripped existing law on electronic surveillance leaving loopholes.... My bill closes those loopholes, restoring the result intended by Congress when it passed [Title III]." 130 Cong.Rec. E4107–08 (daily ed. Oct. 1, 1984) (statement of Rep. Kastenmeier).

**14.** It is the omnipresent two-way telescreens at least as much as, and perhaps more than, the

Second, accepting the government's view that video surveillance is unregulated in domestic law enforcement would lead to another anomaly. As we have seen, when Congress extended its regulation of the use of surveillance techniques into the realm of foreign intelligence-gathering—where the need for such techniques may be somewhat greater than in domestic law enforcement—it included video surveillance. The government's suggestion that Congress chose to regulate such surveillance when needed for purposes of foreign intelligence but to leave open the unregulated use of that technique to every local police department in every minor criminal investigation is highly unpersuasive. Yet the effect of the government's position would be just that—to leave free of statutory restraint the use of video surveillance in all domestic criminal cases, but to regulate it in the cases of the greatest national sensitivity; to leave the decision to use so intrusive a technique to the discretion of low-level local officials, but to deny such discretion to the director of the Federal Bureau of Investigation. *See Torres,* 751 F.2d at 892 (Cudahy, J., concurring). It seems self-evident that Congress could not have intended so incongruous a result.[15]

The four other circuits that have addressed this issue have concluded that because Title I does not expressly mention video surveillance, the statute leaves domestic video surveillance unregulated. They have, however, held that video surveillance is subject to the probable cause and particularity requirements of the fourth amendment, as codified in Title I. *United States v. Mesa–Rincon,* 911 F.2d 1433, 1437 (10th Cir.1990); *United States*

*v. Cuevas–Sanchez,* 821 F.2d 248, 252 (5th Cir.1987); *United States v. Biasucci,* 786 F.2d 504, 510 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *United States v. Torres,* 751 F.2d 875, 885–86 (7th Cir.1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). While the ultimate result reached by the other circuits preserves defendants' constitutional rights, we do not believe their holdings correctly reflect the actions taken by Congress. The role of the courts is to give legislative enactments a sensible and logical construction whenever it is possible to do so through the use of ordinary tools of reasoning and statutory construction, rather than to adopt a sterile and unreasonable interpretation that Congress itself would clearly find unacceptable. That is what we have attempted to do in the case before us.

▮▮▮ For all of the above reasons, we reject the government's view. Video surveillance in domestic criminal investigations is regulated under Title I in the same manner and to the same extent as bugging, wiretapping, and other expressly listed techniques.

## D

▮▮▮ It also follows from the above that we must reject the defendants' argument. We conclude that neither Title I in general nor section 2511(2)(f) in particular bans the use of video surveillance for domestic law enforcement purposes. We recognize that Congress might have legitimately chosen to prohibit the government from ever putting television cameras in the homes and businesses of Americans for anything less than matters gravely impli-

---

perpetual eavesdropping that makes of Oceania such a deeply chilling social vision:

> There was of course no way of knowing whether you were being watched at any given moment.... It was even conceivable that they watched everybody all the time.... You had to live—did live, from habit that became instinct—in the assumption that every sound you made was overheard, and ... every movement scrutinized.

G. Orwell at 4.

**15.** The government notes an isolated remark in the legislative history to the effect that capturing video images without any soundtrack would not constitute an "interception of the contents of an electronic communication," as defined in subsection 101(a)(6) of Title I, *codified as* 18 U.S.C. § 2510(12). S.Rep. No. 541, 99th Cong., 2d Sess. 16–17, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3570–71 (Judiciary Comm.). How-

ever, the very paragraph in which this isolated remark is found begins with the observation that "this bill does not address questions of the application of title III standards to video surveillance...." *Id.* at 3570. This scarcely supports the government's assertion of a congressional intent to address and exclude video surveillance from "the application of title III standards." We are also mindful of the "oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117–18, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) (Rehnquist, J.) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960)). Here, the legislative histories, as well as the integrating provisions of Title III and FISA, clearly demonstrate the 90th and 95th Congresses' intent that their regulation of highly intrusive forms of electronic surveillance be decidedly *comprehensive.*

cating our national security. One could easily argue that video surveillance, the most intrusive form of surveillance, ought not be permitted in a free society. However, the language and the legislative history of the acts we construe here demonstrate that Congress made no such choice. To adopt the construction offered by the defendants we would have to conclude that Title I prohibits a form of surveillance—video—which it does not even mention. The fact is that Title I does not on its face purport to *prohibit* anything. Instead, on its face it purports to *regulate* various forms of intrusive surveillance. Judge Cudahy put it simply: "neither Title [I] nor FISA *prohibits any* specific surveillance method...." *Torres*, 751 F.2d at 894 (Cudahy, J., concurring) (emphasis in original). Because of the absence of any prohibitory language in the statute and because the legislative history contains no suggestion that Congress intended to ban any form of surveillance, we cannot accept the defendants's construction.[16]

In light of the language of both Title I and FISA, the purposes of both statutes, and the legislative history, the most reasonable conclusion is that the definitional awkwardness upon which the defendants' argument rests is merely the result of inadequate drafting or inadvertence. That Congress did not state its intent in the most precise or elegant terms is no reason to deny effect to that intent.

## III

We have concluded that video surveillance may be conducted for domestic law enforcement purposes, but only when the government complies with the procedural requirements set forth in Title I. It is worth noting that as a practical matter the application of Title I to video surveillance will not hamper law enforcement efforts unduly because in most cases video surveillance is used in tandem with aural surveillance techniques concededly subject to Title I. As the government pointed out at oral argument, for video surveillance to be of its maximum value to law enforcement officials it must ordinarily be accompanied by a soundtrack. In order to record a soundtrack, the government is required to seek Title I authorization for a hidden microphone. Because in the vast majority of instances it will contemporaneously seek a soundtrack to accompany video surveillance, the government will ordinarily comply with Title I when it wishes to engage in video surveillance. Moreover, the procedural requirements of Title I are quite compatible with video surveillance. Indeed, the government already routinely conforms its applications for court authorization to conduct video surveillance to Title I. Thus, as the government conceded at oral argument, the application of the procedural requirements of Title I to video surveillance will have little if any practical effect upon current law enforcement practices.[17]

**16.** It could be argued, based on the text of 50 U.S.C. §§ 1809(a) and 1810 that FISA prohibits all forms of surveillance not expressly authorized by FISA or Title I. Section 1809(a) makes it an offense to "intentionally ... engage[ ] in electronic surveillance under color of law *except as authorized by statute* ...." (Emphasis added). Section 1810 provides for civil liability for unauthorized electronic surveillance. However, the defendants do not rely on these provisions. Moreover, even if the argument that sections 1809(a) and 1810 prohibit video surveillance in domestic law enforcement were properly before us, we would reject it. "[I]n interpreting a statute, examination of the whole, not isolated words, will disclose legislative intent." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir.1985). Looking to FISA as a whole, we see no intention to prohibit any form of surveillance. Rather, FISA (along with Title I) specifies who may perform various forms of surveillance and the procedures they must follow. Sections 1809 and 1810 of Title 50 were enacted

as sections 109 and 110 of FISA; they are located after those sections of FISA that set forth the kinds of surveillance covered, and the procedures that must be followed when the government seeks to engage in one of those forms of surveillance. In this context, 50 U.S.C. § 1809(a) is best understood as subjecting to criminal liability anyone who performs electronic surveillance as defined by FISA if that person (a) is not among the individuals who may lawfully engage in electronic surveillance, or (b) fails to comply with the required procedures. Section 1810 has the same effect with respect to civil liability.

**17.** The government's later statement in its petition for rehearing that complying with Title I will be burdensome is, for reasons discussed in the text, *supra*, entirely unpersuasive. Moreover, we do not think that having to obtain authorization from a Deputy Assistant Attorney General in the Criminal Division, or some other Justice Department official mentioned in the

The government's conduct in this case demonstrates our point. Although the application for authorization to conduct video surveillance nominally was brought under Rules 41(b) and 57 of the Federal Rules of Criminal Procedure and the All Writs Act, 28 U.S.C. § 1651, the government contemporaneously sought authorization for a hidden microphone and submitted its "non-Title I" video surveillance application with its Title I hidden microphone application. The contents of the two applications were substantially the same. In compliance with section 2518(1)(f) of Title I the government filed periodic reports of results to support each of its requests for extensions. These reports covered the fruits of both the aural and video surveillance, treating both as one, and each report invoked section 2518(8)(b) of Title I to seal its contents as to the video as well as the aural surveillance. Each of these reports carefully fulfilled the requirements of section 2518, and all but the first were expressly designated as "report[s] regarding the interception of oral communications as visual non-verbal conduct." The one difference between the two applications, according to the government, was that approval for the video surveillance application was requested of the Director of the Office of Enforcement Operations of the Department of Justice, rather than of a Deputy Assistant Attorney General in the Criminal Division or some other official authorized to grant such requests by 18 U.S.C. § 2516(1).[18] The government contends that this constitutes substantial compliance. Because the district court ruled that video surveillance is prohibited by Title I, it never reached the question whether the government's application for authorization to conduct video surveillance, and its actual conduct of the surveillance, conformed to the requirements of Title I. The government's legal argument regarding substantial compliance as well as the factual questions involved should be considered initially by the district court, as should any additional objections the defense may raise with respect to the govern-ment's contention that it met the requirements of that Title. Accordingly, we vacate the district court's order suppressing the government's videotape evidence and remand for consideration of the compliance question and the issuance of a new order.

## CONCLUSION

Because Title I does not prohibit the use of video surveillance in connection with domestic law enforcement, the district court erred in suppressing the government's video evidence on that ground. We also hold that the provisions of Title I are applicable to the conduct of video surveillance in domestic law enforcement cases. Because the district court made no finding as to whether the government's application for authorization and its conduct of the video surveillance in this case complied with those provisions, and because questions of fact and law that merit initial consideration by the district court exist with respect to that issue, we remand to allow the district court to consider the questions involved and to issue whatever order on the suppression motion it ultimately determines to be appropriate in light of this opinion.

## VACATED AND REMANDED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting in part and concurring in the judgment.

Today this court parts company with every other circuit that has considered whether video surveillance is subject to the regulatory regime of the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510–2520 (1988) ["Title I"]. *See United States v. Mesa–Rincon*, 911 F.2d 1433, 1437–38 (10th Cir.1990); *United States v. Cuevas–Sanchez*, 821 F.2d 248, 252 (5th Cir.1987); *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 107, 93 L.Ed.2d 56

---

statute, instead of obtaining that authorization from the Director of Enforcement Operations will unduly burden those charged with enforcing our criminal statutes. *See* text accompanying note 18, *infra*.

**18.** In its brief on appeal, the government asserted that its video surveillance application com-

plied in all respects with Title I. In its petition for rehearing, however, the government states, without acknowledging its error, that because of *the difference described in the text its applica-tion complied substantially but not completely with Title I.

(1986); United States v. Torres, 751 F.2d 875, 885–86 (7th Cir.1984), cert. denied, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). By placing domestic video surveillance under Title I regulation, the majority shackles the government with restrictions imposed neither by the Constitution nor by Congress. I dissent from that action.

In my view the surveillance at issue in this case was lawful because it satisfied the probable cause and particularity requirements imposed on any search by the Fourth Amendment. I would follow the other circuits that have considered the issue and hold that Title I "provides the measure of the government's constitutional obligation of particular description in using television surveillance to investigate crime," but it does not subject television surveillance warrants to the procedural regime it establishes for bugging and wiretapping warrants. Torres, 751 F.2d at 885.

The majority goes further than our sister circuits, holding that before it may conduct a video surveillance, the government must satisfy not only the demands of the Constitution, but also all the additional procedural burdens that Title I imposes upon the government whenever it intercepts "wire, oral, or electronic communications" in the course of a domestic criminal investigation. Though it pretends to do nothing more than fill a gap in the statute, suggesting that the other circuits have held Title I inapplicable to video surveillance merely because the statute does not "expressly mention" the technique, the majority proposes an interpretation that the language of Title I is incapable of accommodating. See 18 U.S.C. § 2516(1), (3) (1988) (authorizing court orders for interception of "wire," "oral," and "electronic" communications in federal criminal investigations, subject to regulation under 18 U.S.C. § 2518 (1988)); 18 U.S.C. § 2510(1), (2), (12) (1988) (defining "wire communication," "oral communication," and "electronic communication"). The language Congress used to define the investigatory procedures regulated by Title I could not be clearer. The statute gives specific meaning to the terms *wire, oral,* and *electronic* communication and they cannot be read to include the images captured by silent television surveillance. Torres, 751 F.2d at 886.[1] "Statutory language, to be stretchable, should be elastic. This statutory language is not." Id. Nor can it possibly matter that the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811 (1978) defines "electronic surveillance" to include the use of video cameras. The domain of that act is quite clear and it does not include domestic criminal investigations.

The consequences of the court's bold initiative cannot be overemphasized. Registering its disagreement with Judge Cudahy, upon whose concurrence the majority in this case relies, the majority in Torres warned: "To read the words of this statute—intercept, aural, communication—as if they encompassed silent visual surveillance would be to say to Congress that there is no form of words that it can use to mark off the limits of a statute that will prevent aggressive, imaginative judges from disregarding those limits." Torres, 751 F.2d at 886. Today's majority says exactly that. It expresses its opinion that the law is anomalous, and finds in that opinion license to eliminate the anomalies. But whatever the majority may think of the logic of Title I, that is the law Congress has written and if it is to be rewritten it must be by Congress, not this court.

Because I agree with the majority's holding that video surveillance of domestic criminal investigations is not unlawful merely because it is not expressly authorized by Title I, and because I believe that the surveillance at issue in this case satis-

---

1. *Torres* was construing not Title I, but its predecessor Title III. As footnote 12 of the majority opinion indicates, Title I defines "intercept" more expansively than Title III. "Intercept" is now defined as "the aural *or other* acquisition of the contents of any wire, electronic, or oral communication." 18 U.S.C. § 2510(4) (1988) (emphasis added). Likewise, the statute has also been amended to authorize courts to order the interception of electronic communications in certain federal felony inves-

tigations. *See* 18 U.S.C. § 2516(3). Those changes have no impact on my analysis. It remains impossible for silent television surveillance to intercept a "wire, oral, or electronic communication." It is worthwhile to point out, however, that when Congress embarked on the substantial overhaul of Title III that led to these changes, it did not add video surveillance to the list of federal investigative techniques that would be regulated by the statute.

fied the requirements of the law, I concur with the majority that the district court's order suppressing the government's video tape should be reversed. But for the reasons I have expressed, I dissent from the majority's holding that warrants for video surveillance in domestic criminal investigations are subject to regulation under Title I.

## ORDER GRANTING PETITIONS FOR REHEARING AND AMENDING OPINION.

Jan. 16, 1992.

Before: NORRIS, REINHARDT, and HALL, Circuit Judges.

Both the United States and the defendants-appellees petitioned for rehearing with suggestion for rehearing en banc of our decision reversing the district court's order suppressing evidence obtained through video surveillance of the defendants. We grant the petitions for rehearing. An order regarding the en banc suggestion will be issued subsequently.

In its brief on appeal, the government asserted that its application for authorization to conduct video surveillance of the defendants complied in all respects with Title I of the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510–2520 (1988). The government now states in its petition for rehearing that although its video surveillance application "substantially complied" with the requirements of Title I, it failed to seek authorization for that surveillance from any of the officials in the Department of Justice designated by that Title and instead obtained approval from a different Justice Department official. The defendants note that the district court never reached the question whether the government's application complied with Title I, because it concluded that Title I prohibits domestic video surveillance. They ask that the matter be remanded for a finding on the issue of compliance. In light of the government's concession, we agree that a remand is appropriate to resolve this issue. Accordingly, Part III of our opinion in this case, filed October 15, 1991, is vacated and the following is substituted in its place:

Judge Hall would reverse the district court for the reasons stated in her concurring and dissenting opinion, filed along with the majority opinion.